# REPORTS

OF

# CASES ARGUED AND DETERMINED

## At the January Term, A. D. 1872.

———————

## MOBILE & MONTGOMERY RAIL ROAD COMPANY
### vs. ASHCRAFT.

[ACTION BY PASSENGER AGAINST COMMON CARRIER, TO RECOVER DAMAGES
FOR PERSONAL INJURIES OCCASIONED BY RUNNING OFF OF A CAR, &C.]

1. *Declaration of conductor of rail road train; for what purpose inadmissible.*—In an action for damages against a rail road company for injuries to the person, declarations made by the conductor of the train to a passenger, a moment before the accident, of the bad condition of the road and his train having run off the track five consecutive times next preceding the present trip, are not admissible in proof of negligence, either as *res gestæ*, or as admissions of an agent binding on the principal.

2. *Declarations made by persons leaping from car to avoid injury; when and for what purpose admissible*—The plaintiff having received his injuries by leaping from the car, while others who remained inside were not hurt, it is proper for him to prove that others besides himself did the same, and also their declarations at the time of their reasons for so doing, to show the reasonableness of his conduct and to avoid the charge of contributory negligence.

3. *Running off of train consecutively before accident; when legitimate evidence.*—In an action by a passenger to recover damages for personal injuries occasioned by a run-off, evidence that the train on which the accident occurred and of which witness was conductor, had run off the track seven or eight times within a month before the accident, is admissible.

4. *Damages, actual and punitive; guide for assessing.*—Punitive damages may be recovered for gross negligence. For a less degree actual damages alone should be assessed.

5. *Bell-rope; neglect to reach through passenger car.*—A charge that the defendant would be liable if the bell-rope did not reach through the

passenger car, at the end of a train, is erroneous ; the neglect must appear to have caused or contributed to the injury.

6. *Damages, punitive; how assessed.* -Punitive damages ought to bear proportion to the actual damages sustained. Wherever the assessment is manifestly unjust, whether it is too small or excessive, the court, in the exercise of a wise and just discretion, should award a new trial.

APPEAL from Circuit Court of Crenshaw.

Tried before Hon. P. O. HARPER.

This was an action on the case containing two counts, brought by appellee against appellant, a common carrier of passengers, to recover damages for injuries received while traveling on one of its trains.

The *gravamen* of the first count was that defendant negligently suffered and permitted its road-bed and track to be in such bad order and condition, that by reason thereof the car in which plaintiff was traveling was thrown from the track, and by negligence of defendant in not having a cord attached to the bell of the engine and passing through the car on which defendant was, no signal could be given the engineer to stop, whereby plaintiff received the injuries complained of.

The *gravamen* of the second count was that defendant failed to use due and proper care safely to convey defendant to his destination, whereby the car on which plaintiff was traveling was thrown from the track, and the conductor jumped off, and there being no bell cord, passing from the bell on the engine to the car, it was impossible to signal the engineer to stop the train, whereby the car was dragged, pulled and jerked along the track for a long distance, by means whereof plaintiff received the injuries complained of, &c.

The suit was originally brought to the circuit court of Butler, but on application of the defendant the venue was changed to Crenshaw county, where the trial was had on the plea of the general issue, " with an agreement between the parties that any matter of defense and reply might be given in evidence under the plea of the general issue, as though specially pleaded and replied. "

On the 14th day of April, 1870, plaintiff, who was an old man, 68 years of age, got on a "cab-car" of a freight train at Greenville, Ala., to go to Montgomery. Near Gilmer's switch, "in the prairies," where the soil is such that rains very easily injure the track and road-bed, the front truck-wheels of the "cab-car," which was the last car, except one, of a long freight train, ran off the track. Behind the cab-car was a car heavily loaded with sugar and molasses, and "coupled" to the "cab-car." This loaded car remained on the track as did also the car to which the front end of the "cab-car" was "coupled." The train dragged the "cab," with the loaded car behind, for a distance of several hundred yards before the train stopped, when it was found that the "cab" had been considerably shaken, the front trucks having badly "splintered" the floor. While the car was thus being dragged along, at the rate of from 12 to 14 miles per hour, the conductor jumped off, then the brakeman, then one Hannon threw off a little boy in his charge and followed himself, after which plaintiff jumped off and received the injuries complained of. Persons who remained in the cab-car were not hurt.

The plaintiff testified that, in jumping off, his forehead was gashed, his nose caused to bleed, his left ankle badly sprained, by jumping off out of the car, so much so that he was unfit for any business for two months. After the accident plaintiff rode to Montgomery on a flat car; had to be helped off the car into a hack; attended with much difficulty to some business next day, and then returned home; it was a long time before his head was free from pain.

Two of plaintiff's sons testified that he lost nine weeks time; that he was confined to the house five weeks, thereby losing opportunity to plant a crop and being kept from a small mill. Witnesses did not think "he made any year $500 at the mill. Plaintiff had been a carpenter before the war, but had not worked at his trade since. These witnesses thought his actual losses about $1,200."

Plaintiff's family physician, called on behalf of defendant, testified that he was not called to see plaintiff until

about a month after the accident; that when he was called in plaintiff was suffering a great deal from a pain in the head which witness thought was occasioned by the rail road accident; that in a short time he recovered and was then as well capable of carrying on his business as before the hurt, and witness did not think his health had been injured, except that plaintiff complained of his head; that his bill would not be over $40; that plaintiff was disabled from attending to business for a month.

It was admitted that three absent witnesses of defendant, if present, would testify that they were, and for several years have been, neighbors of plaintiff; that he has been in the same pecuniary condition as at present for many years; that his labor and services on the farm are not worth over fifty dollars per month, and that with the exception of a month, said to have been lost by reason of the hurt, plaintiff has been at work on his farm, apparently in as good health as ever.

Another physician testified that he had not made any examination of plaintiff's injuries, but that from observing him since then, he could see no difference in his walk or movements. Plaintiff has no regular occupation; he carried on a little farm and some times worked at his trade on jobs in the neighborhood.

William H. Hannon, one of plaintiff's witnesses, who was on the train at the time of the accident, testified that "a short time before the accident occurred he entered into a conversation with the conductor in charge of the train, whereupon the conductor commenced a conversation about the perils of traveling over defendant's road, and stated that he had expected to run off that trip, but believed that he had then passed over the most dangerous places; that he had run off for five consecutive trips before the one he was then making, and said he had as leave go into a battle as to run a train over that road; that during this conversation, and just as the last remark was made, the cab in which the witness, conductor, and other passengers were, ran off, or was thrown from the iron rails. The

defendant objected to the introduction in evidence of this conversation, but the court overruled the objection, and permitted the evidence to be introduced, and the defendant excepted. The witness Hannon further testified that immediately after the cab ran off, the conductor rose and without any pause ran to the door of the cab and jumped out, and that he was the first person who did jump out, or off the train ; that witness saw but one brakeman on the train, who was a negro named Munroe, (and there was no evidence that there was any other brakeman on the train,) and that said Munroe jumped off immediately after the conductor. The plaintiff asked this witness what the brakeman said as to why he had jumped off? The defendant objected to this question, but the court overruled the objection, and allowed the question to be asked, to which the defendant excepted. The witness answered that the brakeman said, " that when he saw the conductor jump off, he thought it was time for him to go too." The evidence showed, in connection with this question to the witness, that when the brakeman made this remark, the train had not been stopped ; that it was soon after the witness had jumped off, as hereinafter stated, and just before the plaintiff had jumped off, as hereinafter stated. The defendant excepted to the ruling of the court in allowing the question to be asked and the answer to be given. The witness Hannon further testified, that the little boy under his charge then started to jump out, but that witness caught and held him, until he thought he saw a good chance, when he threw the little boy out into a ditch ; that witness then himself jumped out ; that the plaintiff next jumped out, and received a cut upon his head, and other injuries.

Plaintiff then asked the witness why he had jumped off the passenger cab as he had testified he did, and why he had thrown the little boy off as he had testified he did. To each of these questions the defendant objected separately ; but the court overruled each objection, and permitted the witness to answer each question, and to each of

said rulings of the court the defendant separately excepted. The witness answered that he jumped off, and threw the little boy off because he thought it was safer under the circumstances to do so than it was to remain on the cab with the little boy."

The witness Hannon testified that he had traveled a great deal on rail roads.

The testimony was conflicting as to whether there was a bell cord attached to the engine and extending through the train to the cab-car, some of the witnesses testifying that there was none, and the conductor testifying that it reached half way into the cab-car, but had been caught in some way so that he could not signal the engineer to stop, when he tried to pull it just before jumping off.

The court, against defendant's objection, permitted the witness Hannon to be asked (for the purpose of showing that defendant received passengers alike on both freight and passenger trains, and charged the same price,) "whether he had or not, about the time plaintiff was injured and within a short time before and after, taken passage from Greenville to Montgomery at different times on both freight and passenger trains." The witness answered that he had, about the time enquired of, frequently traveled from Greenville to Montgomery on both freight and passenger trains, and that he paid the same fare on both trains. To the overruling of its objection and the ruling of the court permitting the witness to answer, defendant duly excepted.

Hugghins, the conductor of the train at the time of the "run off," testified that for several days prior to the accident the weather had been very wet and rainy; that on such prairie soil as that where the accident occurred it was hard to keep the track in order; "that after the accident witness went back to where the wheels of the 'cab-car' ran off the track;" that the occurrence which resulted in the injury of plaintiff was occasioned by what rail road men call a "low joint;" that a "low joint" occurs where the cross-tie on which two rails are joined, and one or

more other cross-ties next on one side of the joint, sink out of place, which causes the depression of one rail, while that joined to it remains in position. In such cases the spikes, having the "chair," or piece of iron holding together the ends of the rails, pull out and the "chair" breaks, while the end of one rail is depressed and the other puts up, and this throws the car off; that in the present case the cross-tie holding the chair had sunk—that the spikes had pulled out leaving the end of one rail jutting up, and that this had thrown the front truck of the cab-car off; that the heavy rains that had fallen shortly before the time of the accident had caused this low joint; that such is the nature of the soil where the accident occurred, that, where heavy rains fall the cross-ties may some times sink suddenly under the weight of a heavily loaded car; that such, in the opinion of witness, was the case here. Witness stated that he had been at the time of the accident a conductor of rail road trains for three years continuously, and was well acquainted with rail roading; that the train on which the accident occurred consisted of twelve cars— that the passenger cab was the eleventh, and that the twelfth car was in the rear of the passenger cab, and was loaded with hogsheads of sugar and barrels of molasses. Defendant then proposed to ask the witness whether, in his opinion, the "low joint" which, in his opinion, had caused the accident, was caused by the passage of the train to which the accident occurred or some previous train. The plaintiff objected to this question, on the ground that it could not be a question of skill or science upon which the witness could give his opinion, as to what particular train or car, if any, caused the low joint. The court sustained the objection and refused to permit the question, and the defendant excepted.

This witness further testified, that finding his bell rope, which reached half way in the "cab," was caught, he immediately jumped off so as to give the signal, and did signal by hand, to the engineer to stop. On cross examination, being asked by plaintiff to explain why the "low

joint," which in his opinion, had thrown off the cab, did not likewise throw off the last car, the witness stated that he was unable to give the explanation.

This witness was also asked on cross-examination how often, within a month immediately preceding the injury to plaintiff, the freight trains of which he was conductor, had run off. Defendant objected to this question as being illegal and irrelevant, but the court overruled the objection, and the defendant excepted. The witness answered seven or eight times.

C. P. Ball, a witness for defendant, who was proved to have been a man of skill in rail road matters, and for many years connected with them, and who was the assistant superintendent of the road, after testifying at length as to the condition of the road, the "means and number of employees used to keep it up," was asked on cross-examination if accidents did not more frequently happen to defendant's freight trains than to its passenger trains, and if they did not more frequently run off about the time plaintiff was injured, than did the passenger trains.

To this question defendant objected. The plaintiff stated that the object of the question was to show negligence of defendant in regard to its freight trains. The court overruled the objection of defendant and permitted said question to be asked, and defendant excepted. The witness answered that about the time plaintiff was injured accidents were frequent to the freight trains, and that they rarely occurred to the passenger trains.

The court gave the following charges, to which defendant excepted:

"3. That if the negligence of defendant, as charged in the complaint, had been established by the evidence, to the satisfaction of the jury; and that if the evidence further showed that the plaintiff had been injured thereby, and had suffered physical pain and mental distress as the direct consequences of such injuries, that then the jury, taking into view all the circumstances of the case, might, in their discretion, assess against defendant damages over

Mobile and Montgomery Railroad Co. v. Ashcraft.

and above the amount of the actual damages the proof might show the plaintiff had sustained, but that in assessing such damages they, the damages, should not be unreasonable in amount, and should not be prompted by prejudice, passion, or partiality. That as had been said by our own supreme court, (Rhodes vs. Roberts, 1 Stewart,) negligence might be very gross and reprehensible; and if in this case the jury believed that the negligence was gross and reprehensible, they might give smart damages; but that whether it had been so or not, in the present case, was a question for the determination of the jury under all the evidence in the cause."

"4. That the statute law of Alabama requires a conductor on every passenger train on any rail road in this State, at any time when his train is in motion, to have a cord attached to the bell on the engine and passing through each passenger car attached to his train; that any rail road train which takes passengers on board for transportation in this State is a passenger train within the meaning of this statute; and that if the jury believe, from the evidence, that the train on which it is contended the plaintiff was a passenger, did not have a bell rope attached to the bell on the engine and running back clear through the car on which it is contended plaintiff was a passenger, then the defendant would be liable in this case." To this charge the defendant excepted. The bill of exceptions immediately recites that "the court did not mean by the last mentioned charge to charge upon the effect of the evidence, nor was the charge given last above stated excepted to at the time it was given, on the ground that it was a charge upon the effect of the testimony; the counsel for defendant not mentioning any ground of exception at the time of the exception. The court meant simply to charge that if the bell rope did not run entirely through the passenger car the rail road company were in default; but the charge was given without this explanation." The court further charged the jury, but not in immediate connection with this charge, that the jury must look to all the facts and

circumstances of the case in evidence to ascertain whether the defendant was liable.

The defendant then asked the following charges in writing, each of which the court refused, and to each of which refusals the defendant excepted :

"3. That unless the proof shows that the plaintiff was injured by the defendant wilfully, or by the wilful negligence of defendant, or by some act or omission of duty amounting to a wilful disregard of duty, the plaintiff is not entitled to recover exemplary damages."

"4. That if the evidence shows that the defendant fairly and honestly used every means known to rail road men to prevent accidents on their rail road, and were not guilty of any wilful or gross disregard of duty, then the plaintiff could not recover more damages than he has actually sustained, if entitled to recover at all."

"5. That if the company used all ordinary means for the preservation and safety of the passengers on the trains upon which plaintiff was traveling, and was not guilty of any wilful disregard of duty, then the plaintiff, if entitled to recover at all, can only recover such actual damages as he had proven."

"6. That the plaintiff, on the evidence in this case, can not recover anything more than the actual damages sustained, unless the evidence shows such gross negligence as amounts to a wilful disregard of duty, even if entitled to recover at all."

The court, at the request of the defendant, charged that the fact that the defendant is a corporation does not entitle the plaintiff to any more damages, if entitled to any at all, than if the defendant were a natural person.

The jury found a verdict for plaintiff, and assessed his damages at $4,000 00, and hence this appeal.

The various rulings of the court below, to which exception was reserved, the giving of the charges excepted to, and the refusal to give the charges asked, are now assigned as error.

HERBERT & BUELL, and RICE, CHILTON & JONES, for appellant.—1. The evidence as to the conductor's conversation with Hannon was clearly inadmissible. It occurred before the car ran off, ceased at once, had no connection with the run off, and was not even shown to have been made in presence of appellee. It constitutes no part of the *res gestæ.*—20 Ala. 126; 1 Greenleaf Ev. § 113; Starkie, 89; *Evans v. Cochran & Estill,* 18 Ala. 479; *Brown v. Harrison,* 17 Ala. 774.

2. The testimony as to what the brakeman said *after* he had jumped off was inadmissible. Appellee neither heard nor was influenced by it. It was but an unsworn narrative of a then past event.

3. Allowing Hannon to state why he threw the little boy off was clearly improper. His statement, that he did it because he "*thought* it was safer, &c.," was but a mere giving of his unsworn opinion. It is not shown that he was an expert. The witness evidently referred to his opinion *at the time* of the accident, and that might have been influenced by fear and entirely incorrect.—See 23 Ala. 469; 27 Ala. 480; 24 Ala. 201.

4. Witness Hugghins was a skilled witness and should have been permitted to answer the question asked of him. 24 Ala. 21.

5. There being no case in this State, clearly defining and measuring the rule of damages in a case of this sort, it is important for the future that it be definitely settled. Any indefiniteness is apt to lead to speculative law suits. The law should hold common carriers strictly responsible for *actual* damages, but beyond this, in the absence of *fraud, malice* or oppressive intent, they should not be held. Sedgwick on Damages, 35.

Carriers of passengers are not insurers—they must exercise the highest degree of skill and care, but if after this unavoidable accident occur, they are not liable.—2 Redfield on Railways, 178–84. The proposition that any negligence is gross negligence can not be maintained.—Shearman

& Redfield on Negligence, § 600. The verdict under the evidence is excessive. At most, it is impossible for the appellee to have lost over two hundred dollars in *actual damage;* the proof can not justify the charge of gross negligence, and yet $4,000 is the verdict for a slight rail road injury.—*Heil v. Glanding,* 42 Pa.

6. Punitive damages can have no foundation unless based on *gross* neglect.—Shear. & Red. on Negligence. The third direct charge is so worded, as to allow punitive damages without the gross neglect. Of the charge about the bell rope it need only be said, that it makes defendant liable, without any regard whatever to the fact whether the want of bell-rope had any thing, one way or the other, to do with the accident, either directly or indirectly. Tested by the rules of law enunciated above, the charges requested by defendant should have been given.

7. The questions permitted to be answered as to the train running off before the accident, were calculated to, and did bring out illegal evidence. The issue was whether at *this time* there was neglect; not whether the conductor had been negligent at other times. If such testimony be admissible to show negligence, why may not testimony that for months before the run-off no accident had occurred, be admissible to show due care? Admitting negligence in the past accidents is not legal proof that there was negligence in this. If plaintiff may go into past accidents, defendant would have the right to show that they were all by unavoidable accident, and thus the court in trying one case of this kind would have to settle numerous others; admitting such evidence unsettles all well-established rules on the subject. The effect of its admission was only to prejudice the defendant.

8. The question to Hugghins, as to what train caused the "low joint," was proper. Plaintiff sought to fix gross negligence on defendant. If some other train had made it and some time had been allowed to elapse and another train allowed to run over it before the defendants' servants remedied it, that might constitute reprehensible negli-

gence, when, if the low joint were occasioned by the train that ran off, it might be unavoidable accident. Whether it was accident or neglect is for the jury to say, and it was material in determining that question for the jury to know what train caused the "low joint."

JUDGE & HOLTZCLAW, and WATTS & TROY, *contra.*—1. The conversation had with the conductor was properly admitted. Corporations can act only by agents, who are often, for all practical purposes, the corporation itself. The conversation was within the scope of conductor's authority, while he was performing the duties of his agency and carrying on the business of the principal—*dum fervet opus.* The conversation was part of the *res gestæ,* besides being a declaration binding on the defendant.—*Morse v. Conn. R. R.,* 6 Gray, 450.

2. The declarations of the brakeman were competent. They were part of the *res gestæ,* and were evidence of a very high grade to show that defendant acted prudently in jumping off.—2 Redfield on Railways, § 179.

3. The question to Hugghins was improper. It made no difference what train made the "low joint." If the "low joint" was occasioned by negligence, it matters not who occasioned it. The testimony of the witness shows that his opinions on this matter were mere guesses. No facts were given or means stated, whereby the witness could judge that the "low joint" was occasioned by one train or another.

4. The questions to Hugghins as to how often his train had run off, &c., were proper. The answer showed habitual neglect, or that road and machinery were out of repair, and hence, that greater care and skill than was bestowed were needed. The question was confined to the time almost immediately preceding. The question to Ball as to the "freight trains running off oftener than passenger," &c., falls under the same reasoning. Taking passengers on the freight train, the defendant was bound to use the same care as if the passenger was in the regular passenger

train. The fact that passenger trains seldom ran off, while the freight trains often did during the same period, manifestly showed negligence on the part of the defendant's servants in charge of the freight train.

5. The testimony of Hannon as to why he threw off the little boy, was clearly competent. The plaintiff must have had reasonable cause to believe he was in danger to justify his leaping from the car. The effect made on the minds of persons in the car with him—evidenced by what they said and did at the time—is the most satisfactory kind of evidence to refute a charge of contributory negligence. The witness was an experienced traveler by rail, and it was competent for him to give his opinion as to whether it was safer to jump or remain.

6. The charges given and refused, must of course be considered in reference to the evidence. The court will see from an inspection of the Record that defendant had its case *fairly* submitted to the jury. As to the measure of damages in a case like this, see 2 Redfield on Railways, 220. *Such verdicts are the only corrective of oftentimes a most flagrant disregard of human life, &c.* The testimony certainly tended to show great negligence in this case. The defendant took passengers on both freight and passenger trains. The freight trains were all the time running off, and the passenger trains seldom doing so. There was, therefore, a proper predicate for the affirmative charges of the court on that subject.—See *Day v. Wadsworth*, 13 Howard, U. S. 363.

As to what suffering and pain should be compensated for, see 22 Conn. 293; 29 Conn. 390; 32 Maine, 271; 13 California, 599.

7. Rail roads, though not insurers of passengers, are held to the "*utmost* watchfulness and care."—21 Howard U. S. 202; 18 New York, (4 Smith) 168. Therefore, there is no difference in such cases between "negligence" and "gross negligence."—16 Howard, 469; 2 Redfield on Railways, 210.

8. The first affirmative charge excepted to was correct.

11 Grattan, 697 ; 16 Pickering, 547 ; 13 B. Monroe, 219 ; 35 Pa. State Rep. 60.

9. The second affirmative charge excepted to only asserts, if looked to carefully, that defendant would be liable for *nominal* damages, if there was no bell rope, and plaintiff was injured on such train.—*Bagley v. Hains*, 9 Ala. 173.

10. The object of the statute was to have the bell rope in reach of every passenger in case of accident. Half way compliance with the law amounts to nothing. One of the issues was as to negligence in not having a bell rope, &c. If this was found in favor of plaintiff, he is always entitled to at least a *nominal* verdict of damages.

11. The charges asked by defendant were properly refused. They based the plaintiff's right to recover on " *wilfulness*," or " wilful neglect," or " wilful disregard of duty," &c. Any neglect by carrier is gross enough to allow exemplary damages. The other charges were bad generally ; they are mingled with the proposition, " if the plaintiff is entitled to recover at all," as though the judge should say (as he would in giving them) it is doubtful if plaintiff has made out a case.

B. F. SAFFOLD, J.—The suit was for damages on account of injuries received by the appellee, through the negligence of the appellants, as common carriers of passengers.

The plaintiff's witness, Hannon, was permitted to tell what the conductor of the train on which the plaintiff and the witness were, at the time of the accident, said to him a moment before the occurrence, about the bad condition of the road, and his running off the track five consecutive times before this trip These declarations can not be considered as any part of the *res gestæ*, because they did not spring out of the accident, conduce to it, or have any necessary connection with it. If they are receivable, they must be so, as an admission of an agent binding on the defendant, of the bad condition of the road. In Fairlie vs. Hastings, 10 Vesey, 123, Sir William Grant has drawn

so clear and correct a line of separation on this subject of the admissibility of statements made by an agent, that it is sufficiently decisive of this point merely to repeat what he says : " As a general proposition, what one man says not upon oath, can not be evidence against another man. The exception must arise out of some peculiarity of situation coupled with the declaration. An agent may undoubtedly, within the scope of his authority, bind his principal by his agreement, and, in many cases, by his acts. What the agent has said may be what constitutes the agreement of the principal, or, the representations or statements made by him may be the foundation or the inducement to the agreement. Therefore, if writing is not necessary by law, evidence must be admitted, to prove that the agent did make that statement or representation. So, with regard to acts done, the words with which those acts are accompanied, frequently tend to determine their quality. The party, therefore, to be bound by the act, must be affected by the words. But, except in one or other of those ways, I do not know how what is said by an agent can be evidence against his principal. The mere assertion of a fact can not amount to proof of it, though it may have some relation to the business in which the person making that assertion was employed as agent. The admission of an agent can not be assimilated to the admission of the principal. A party is bound by his own admission, and is not permitted to contradict it. But it is impossible to say a man is precluded from questioning or contradicting any thing which any person has asserted as to him, as to his conduct or his agreement, merely because that person has been his agent. If any fact material to the interest of either party rests in the knowledge of an agent, it is to be proved by his testimony, not by his mere assertion. "

It is true, there is a difference between the agent of a corporation and the agent of an individual, because the corporation, if it act or speak at all, can do so only through an agent. Some of its agents are in some instances the corporation itself, and others are its mere employees or

servants. It would be equally unjust to charge it with all the statements of its agents, or to relieve it entirely from responsibility for such declarations. If the statements of the conductor had been made the day before the accident, they would not be supposed to be the admissions of the defendant, or to be a part of the *res gestœ*. Their coincidence alone, without other connection, can not change their character.

The plaintiff jumped from the car and received his injuries in doing so. Other passengers who remained in the car were not hurt. If he contributed to his own injury by want of proper care, he would not be entitled to recover. The degree of care required of him is in proportion to the degree and imminence of the danger. It was very necessary for him to show that his share in the transaction was innocent, and not incautious    This he undertook to do by proving that the conductor and the brakeman leaped off, and that a passenger, with deliberation, took up and dropped into a ditch a small boy, his relative, and then jumped off himself, as well as proving reasons given by this passenger and the brakeman at the time why they did so. We regard these declarations as a part of the *res gestœ*, and more convincing of the reasonableness of abandoning the car, or, at least, the absence of any negligence, recklessness or undue fright, than the testimony to that effect of the persons themselves some time after the occurrence.—1 Phil. Ev. 185.

The accident occurred to a freight train having one passenger car attached. The witness was very properly permitted to say that he had frequently traveled on the road about the time of the accident, on both the passenger and freight trains, and therefore knew that passengers were received on the freight train, and charged the same price, as on the other.

It was a mere conjecture of the witness Hugghins that the car had been thrown off the track by a "low joint," or that there was a "low joint." He could not, therefore, give an opinion as to which train had made it.

The testimony of this witness, that the freight trains, of which he was conductor, had run off the track seven or eight times within a month next preceding the injury to the plaintiff, was legitimate.—Shearman & Redfield on Negligence, § 448.

There was no error in the plaintiff's asking the assistant superintendent of the road, Ball, if the freight trains did not more frequently run off the track about the time of the accident, than the passenger trains.

The charges given and refused, to which exception was taken, may best be considered together. The third and fourth direct charges were erroneous. The first, because it asserted that negligence sufficient only for the recovery of actual damages would authorize a verdict for greater damages. In cases of this sort there are but two degrees of negligence, and two measures of damages for it. One, for which the actual damages, consisting of the expense of cure, time lost, and fair compensation for physical and mental suffering, and a permanent reduction of the power to earn money, may be recovered. The other, gross negligence, for which exemplary or punitive damages may be given.

The second, because it conveyed to the jury the impression that the neglect to have the bell rope reach through the passenger car, would alone authorize a verdict of actual damages, at least, in favor of the plaintiff. This is not so, without such neglect was the cause of the injury. The jury was not left at liberty to find whether it was or not.

It seems to be clearly established by the American authorities that exemplary, vindictive, or punitive damages can never be recovered in actions upon any thing less than gross negligence.—Shearman & Redfield on Negligence, § 600.

Gross negligence is defined to be the want of even slight care and diligence. In determining what amounts to any specified degree of care in each particular case, the thing to be taken care of, and the danger to which it is exposed, are the chief considerations. The law exacts a greater

degree of care in respect to life, than to property. From those whose occupation involves great risk of life, it demands the utmost care. In such cases gross negligence is attained much short of that culpable degree which by the common law is denominated crime. Of course gross negligence may be of more or less aggravated character requiring a corresponding graduation of the amount of damages to be assessed. The punitive damages ought also to bear proportion to the actual damages sustained.

The court very properly charged the jury that greater damages ought not to be assessed against a corporation, than should be against an individual, under the same circumstances. It is the province of the court to see that justice is done, and when the assessment is manifestly unjust, whether too small or excessive, a new trial should be granted. This, however, should be done, not arbitrarily, but in the exercise of a wise and just discretion.

The judgment is reversed and the cause remanded.