Argued June 4; reversed July 2; rehearing denied
September 10, 1940

# RAYMOND ET UX. *v.* SHELL OIL CO. OF CALIFORNIA

(103 P. (2d) 745)

*Edgar Freed*, of Portland (Simon, Gearin, Humphreys & Freed and W. L. Gosslin, all of Portland, and W. C. Winslow, of Salem, on the brief), for appellant.

*John H. Carson* and *Custer Ross*, both of Salem (Carson & Carson and Asa L. Lewelling, all of Salem, on the brief), for respondents.

ROSSMAN, J. This is an appeal by the defendant from a judgment of the circuit court in favor of the plaintiffs, based upon a jury's verdict and entered in an action instituted by the plaintiffs to recover damages resulting from the defendant's alleged wrongful interference with a contract which the plaintiffs allege existed between them and one O. L. Hammond. The plaintiffs are George A. Raymond and his wife, Thelma M. Raymond. They were the owners of the automobile service station which we shall shortly describe. The former was its manager and we shall refer to him as the plaintiff. The plaintiffs contend that the

alleged contract bound Hammond to supply their service station with gasoline.

The defendant's (appellant's) brief submits and argues ten assignments of error. We shall now dispose of the first two. They are based, respectively, upon the denials of the defendant's motions for a nonsuit and a directed verdict. The defendant called no witnesses. The two motions just mentioned were based largely upon contentions that the alleged contract never existed and that, if there ever was such a contract, the defendant had no knowledge of it.

The plaintiffs, in March, 1938, and for six years prior thereto were engaged in business in Salem in the sale of gasoline, tires, batteries, etc., and in the repair of automobiles. Their place was equipped with four gasoline pumps. Beginning in March, 1937, they sold the brands of gasoline produced by the defendant. The price which they paid was four cents per gallon less than the prevailing retail price. However, they allowed all customers who bought first-grade gasoline and paid cash or possessed credit cards a discount of two cents per gallon. The defendant, through its local officials, objected to this practice and endeavored to persuade the plaintiffs to abandon it. Their efforts were unsuccessful.

The plaintiff swore that in the early part of March, 1938, J. E. Puhlman, the defendant's local manager, again sought to persuade him to forego the use of cash discounts, and "told me 'you better get on the line.'" In the gasoline trade, so the plaintiff said, the expression "on the line" means "You have to get on the line and stay there and do as they want you to do." He swore that Puhlman also told him that he "would have to either get on the line, or else  *  *  *  or else no

more gas." Puhlman told him further that unless he abandoned his discount practice "We will have to dry you up, George, that's all." Being asked what was meant by the expression "dry you up", the plaintiff replied, "In the terms of a service station, if they say they are going to 'dry you up' that means you aren't to get any more gas."

The plaintiffs refused to comply with Puhlman's demands, and after March 15, 1938, the defendant delivered no more gasoline to them. The plaintiffs concede that since they had no contract with the defendant, the latter violated no rights belonging to them when it severed its relations with them. The complaint alleges, in the words which we shall now quote from it, what happened after the defendant's deliveries ceased:

"Following said time of refusal of defendants so to deliver gasoline plaintiffs entered into an arrangement and agreement with one O. L. Hammond, doing business as the Salem-Tillamook Oil Company of Salem, Oregon, whereby and by the terms whereof said Hammond agreed for the period of one year from that time to sell to plaintiffs, and plaintiffs agreed to purchase from said Hammond, at wholesale, plaintiffs' requirements of gasoline, and the various grades thereof, at prices equivalent to the customary retail prices for such gasoline prevailing at Salem, Oregon, and the vicinity thereof, less four cents per gallon, and that pursuant to said arrangement gasoline was purchased by plaintiffs from said Hammond for the period of March 18, 1938, to March 23, 1938; that said Hammond was during all said time, and for a long time theretofore and thereafter, a distributor of, 'Richfield' gasoline at Salem, Oregon, and the vicinity thereof.

"Thereafter, and at a time or times between March 18, 1938, and March 23, 1938, the exact time being to plaintiffs unknown, defendants wrongfully, knowingly, unlawfully and maliciously, and by means to plaintiffs

not fully known, did prevail on, cause and induce said Hammond to refuse to make further sales or deliveries of gasoline to plaintiffs, and the said Hammond did, on or about March 23, 1938, notify and inform plaintiffs that he, the said Hammond, would make no further sales of gasoline to them, and then refused and at all times thereafter continued to refuse to make any such sales; that said breach by said Hammond of said agreement with plaintiffs for the furnishing of gasoline to plaintiffs, as aforesaid, was caused solely and entirely by said acts and wrongful conduct of defendant; * * *''

The plaintiffs quote the following from IV, Restatement of the Law, Torts, Section 766, as a statement of the principle which governs this case:

''Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to

''(a) perform a contract with another, or

''(b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.''

We observe that statement is followed on page 56 with the following comment:

''To be subject to liability under the rule stated in this Section, the actor must have knowledge of the business expectancy with which he is interfering. This is true whether the expectancy is one described in Clause (a) or in Clause (b). Thus, although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise purposely cause that failure if he has no knowledge of the contract.''

It will be observed that the thing with which the plaintiffs say the defendant interfered was a contract between the plaintiffs and the aforementioned Hammond. We deem that fact important, and in order to

be sure revert to the complaint. Its averments quoted above say that the plaintiffs had "an arrangement and agreement with" Hammond. It should be noted that they use the conjunctive "and" and not the alternative "or". The quoted expression is shortly followed by other language obviously intended to clarify and make certain the meaning intended. Thus, they say: "Hammond agreed for the period of one year from that time to sell to plaintiffs, and plaintiffs agreed to purchase from said Hammond, at wholesale, plaintiffs' requirements of gasoline." Still later, after the complaint averred the defendant's purported wrongful conduct, it says: "Said breach by said Hammond of said agreement with plaintiffs for the furnishing of gasoline to plaintiffs, as aforesaid, was caused solely and entirely by said acts and wrongful conduct of defendant." Hence, it is clear that this case falls within subdivision (a) of the legal principle expressed in the Restatement.

But the plaintiffs now seek to place this case within subdivision (b) of the Restatement. That being true, we read the transcript of evidence in order to ascertain the point of view which the plaintiffs had at the time of the trial. The transcript indicates that throughout the trial the plaintiffs were constantly insisting, in harmony with the averments of their complaint, that they had a contract with Hammond which required him to supply their gasoline requirements, and that the defendant wrongfully caused Hammond to breach that contract. That such was their line of attack during the trial is indicated quite clearly by the instructions which were given to the jury.

In his instructions to the jury the presiding judge read the complaint, including the paragraphs which

we quoted above. Before stating to the jury the legal principles which were applicable to the issues, he said:

"Now, in this action plaintiffs claim they had a contract with O. L. Hammond by which he was to furnish them with gasoline, and they claim defendant Shell Oil Company induced Hammond to break this alleged contract and that as a result plaintiffs suffered damages. * * * It is necessary for plaintiffs to establish by a preponderance of the evidence that O. L. Hammond entered into a contract with plaintiffs, Mr. and Mrs. Raymond, in March, 1938, by which said Hammond agreed to furnish them with their requirements * * *. In order to find for plaintiffs you must find from a preponderance of the evidence that Hammond broke said contract and that plaintiffs suffered damage to their business by reason thereof, and also that defendant knew of the existence of the alleged contract and induced Hammond to break such contract as alleged in their complaint."

■ In order to prove the alleged contract, the plaintiff gave the testimony which we are about to quote. Before quoting it, however, it is pertinent to note that the transcript of testimony contains no other testimony which in any way indicates whether or not the plaintiffs and Hammond effected the alleged contract. Neither Hammond nor Mrs. Raymond testified. Both the plaintiffs' and the defendant's briefs quote the testimony which we have in mind, and which follows:

"Q. Did you have any agreement with Mr. Hammond to purchase gasoline from him to meet your requirements?

"A. I did.

"Q. What deal did you have with Mr. Hammond?

"A. Hammond said he would see I wouldn't be out of gasoline, he said he would see I always had gasoline.

"Q. For how long a period of time was this arrangement made for?

"A. Oh, I imagine it was like most of them, a year at a time.

"Q. What, if anything, was said about price?

"A. The price—he said he couldn't give me a better price than I was getting from Shell. I told him I didn't want it.

"Q. Was there any provision, under the deal you made with him, as to what you would charge your customers at retail?

"A. No.

"Q. Where were you to take delivery of the gasoline?

"A. Out to his plant.

"Q. Whose plant?

"A. Richfield.

"Q. That would be Mr. Hammond's plant?

"A. Mr. Hammond's plant.

"Q. Did you get gasoline there?

"A. I did.

"Q. Over approximately what period of time?

"A. I think it was about three days is all, three or four."

It is obvious that the above testimony does not show a contract. The plaintiffs did not bind themselves to do anything. Lest it be assumed that the plaintiff inadvertently neglected to testify that he had actually agreed to purchase his requirements from Hammond, we add that in the three- or four-day period that Hammond supplied the plaintiffs with some gasoline the plaintiff made purchases from another dealer, Marvin Lewis, who was also a wholesaler of Richfield gasoline. Therefore, we arrive at the conclusion that the aforementioned averment of the complaint has not been supported by any evidence whatever. Since the record fails to indicate that the plaintiffs and Hammond effected the alleged contract, the motions under consideration should have been sustained. But we will go on.

It will be recalled from the comment which we quoted from the Restatement that the alleged wrongful party must be shown to have possessed "knowledge of the business expectancy with which" he is alleged to have interfered. The comment continues that if the purported wrongdoer is ignorant of the contract of which he causes nonperformance, he is not responsible for the results. The plaintiffs concede the legal principle which we have been endeavoring to describe. The following is quoted from their brief:

"Appellant points out that plaintiffs must have proved defendant's knowledge of the existence of the contract between Raymond and Hammond. That is, of course, the law."

Having made that concession, their brief then comments upon two items of evidence which they claim show that the defendant was aware of the purported contract. We shall now review those two items.

After the plaintiff had given the testimony which we have already quoted, he was then asked, "And how did you come to quit getting gasoline there?" and answered, "Mr. Hammond told me he couldn't supply me any more." At this point the defendant's counsel objected that Hammond's declaration would not be admissible against the defendant, and thereupon extensive colloquy between counsel representing the two parties and the court ensued, at the close of which the plaintiff was asked by his counsel, "State whether or not Mr. Hammond gave or assigned to you any reason for taking that position." His answer and what followed is set forth in the following quotation:

"A. No, he didn't at the time. I went to see him and when I went to see him he said Mr. Puhlman and Mr. Stohl had been out there, and he left it drop at that.

"Q. Did he at a later time explain to you the reason?

"A. He did.

"Q. What was the reason?

"A. He said they were putting the pressure on him and he wasn't sitting any too good with Richfield himself so he guessed he would have to leave me alone."

■ Although it is now claimed that the above-quoted testimony indicates that the defendant was aware of the purported Raymond-Hammond contract, it was offered as proof that the defendant caused Hammond to breach his contract. An exception to the Hearsay Evidence Rule, which is fully discussed in Wigmore on Evidence (3d Ed.), §§ 1714-1732, deems admissible declarations which throw light upon the reasons or motive of the declarant, provided that at the time of making the declaration he was engaged in the performance of a relevant act, or was refusing to perform an act expected of him and which is relevant to the cause on trial. Ordinarily, it is impossible to penetrate the human mind and observe what is going on there. But the expressions upon the countenance, or a declaration accompanying an act, may be a strong indication of the thoughts within. For instance, in *Charley v. Potthoff*, 118 Wis. 258, 95 N. W. 124, in which the relevant fact was the character of a theatrical performance, the court, in sustaining the admissibility of expressions of disgust uttered by members of the audience as they left the theater, said, "We can conceive of no clearer case of admissibility * * * than declarations of people, in the very moment of leaving a theater, of the reasons for so doing."

Professor Wigmore, in § 1714 of his above-cited text, in explaining the basis of this exception to the Hearsay Evidence Rule, says:

"It rests on the consideration that, though the person's testimony on the stand may still be both actually

and conveniently practicable, yet the probability of their receiving from him testimony which shall be in value equal or superior to certain hearsay statements is small; thus while there is hardly a necessity in the strict sense, there is at least a desirability of resorting also to the hearsay statements. Applied specifically to the present Exception, the judicial doctrine has been that there is a fair necessity, for lack of other better evidence, for resorting to a person's own contemporary statements of his mental or physical condition.''

The eight words last quoted appear in italics. Professor Wigmore continues:

''It might be argued, however, that the person's own statements on the stand would amply satisfy the need for his testimonial evidence. The answer is that statements of this sort on the stand, where there is ample opportunity for deliberate misrepresentation, and small means for checking it by other evidence or testing it by cross-examination, are comparatively inferior to statements made at times when circumstances lessened the possible inducement to misrepresentation.''

Both parties cite *Hadley v. Carter*, 8 N. H. 40, 42. Wigmore, in the section just mentioned, quotes from that decision the following:

'' 'The evidence is admitted on the presumption, arising from experience, that when a man does an act his contemporary declaration accords with his real intention, unless there be some reason for misrepresenting such intention.' ''

In *State v. Ryder*, 80 Vt. 422, 68 Atl. 652, the court was concerned with the admissibility of a declaration made by an individual who was destroying a letter. In holding that the declaration was admissible, the court said:

''The declaration accompanied the act, was calculated to explain and elucidate it, and was so connected

with it as to be a part of it, and to derive some degree of credit from it. In such cases the credit that the act gives to the accompanying declaration as a part of the transaction, and the tendency of the declaration to explain the act, distinguish this class of declarations from mere hearsay. Such declarations derive credit and importance as forming a part of the transaction itself, and are included in the accompanying circumstances, which may, as a rule, be given in evidence with the principal fact.''

Thus it is observed that the declaration to be admissible must be contemporaneous with the act. A good illustration is found in *Mobile R. Co. v. Ashcroft*, 48 Ala. 15, in which the plaintiff, anticipating that the train upon which he was riding was about to meet with disaster, jumped from it, thereby receiving injuries. In order to show that his act in jumping from the car did not amount to contributory negligence, he offered the declarations of the conductor, brakeman and a passenger who, upon leaping from the same train, expressed their fears. In holding the declarations admissible, the court said:

''We regard these declarations as a part of the *res gestae* and more convincing of the reasonableness of abandoning the car, or, at least, the absence of any negligence, recklessness or undue fright than the testimony to that effect of the persons themselves some time after the occurrence.''

■ It is, therefore, the absence of opportunity to devise false reasons and the circumstance that the declaration is so closely related to the matter in hand that it may be presumed that the latter spurred on the mind to speak, that renders the declaration admissible. But when a period of leisure separates the transaction and the declaration, so that the latter becomes mere narra-

tive, the declaration assumes the form of pure hearsay and is inadmissible.

■ Now let us revert to the facts before us. If Hammond refused to honor the plaintiffs' requisitions, his act of refusal was equivocal in nature; that is, it may have been the result of any one of a number of reasons. That being true, declarations indicating the reason which prompted his refusal and made simultaneous with it would be admissible within the exception to the Hearsay Evidence Rule now under consideration. But the declarations indicated by the above-quoted testimony did not accompany any refusal by Hammond to sell gasoline to the plaintiffs. As the latter himself testified, Hammond "did not at the time" of refusing to sell, make the declaration. Having so testified, he was asked, "Did he at a later time explain to you the reason?" In other words, narrative was sought, not a declaration prompted by a refusal. The very reason upon which the exception is based (Wigmore on Evidence (3d Ed.), § 1714) which demands that the act and the declaration must be simultaneous, or, to use another word, contemporaneous, and thus afford no leisure for falsification, is not present when the declaration is made tardily. For that reason, we are satisfied that the quoted testimony cannot serve the plaintiffs' purpose.

■ We said that the plaintiff depended upon two items of testimony to prove that the defendant was aware of the purported Hammond contract. We have just disposed of one of them. We shall now mention the second and shall employ the language of the plaintiffs' brief, which follows:

"Further evidence that Shell knew of the contract between Raymond and Hammond is found in the threats of Puhlman that he was going to 'dry up' Raymond."

It will be recalled that Puhlman's purported statement, "We will have to dry you up, George, that's all" was made before the defendant ceased delivery of gasoline to the plaintiffs. By reverting to the paragraph of the complaint previously quoted, it will be seen that the purported contract of Hammond was not effected until after the defendant had ceased delivering gasoline to the plaintiffs. That paragraph says:

"Following said time of refusal of defendants so to deliver gasoline, plaintiffs entered into an arrangement and agreement with one O. L. Hammond."

Manifestly, the defendant could not have known of the purported Raymond-Hammond contract before it was made. But, as we have shown, no such contract ever came into existence. Accordingly, both of these items of evidence fail to indicate that the defendant had any knowledge of the purported contract.

Summarizing, we find (1) the plaintiffs presented no testimony indicating that they had entered into a contract with Hammond; and (2) assuming that such a contract did exist, there is no evidence in the record indicating that the defendant had any intimation of it. As we have seen, the complaint is based upon the theory that the defendant wrongfully interfered with the purported contract. The transcript of proceedings during the trial, as well as the instruction to the jury previously quoted, indicate that the trial was conducted upon that theory. But if the plaintiffs should now be permitted to switch to a different theory, as they endeavor to do in their brief filed with this court, that is, to a contention that the defendant interfered with their business relation within the contemplation of subdivision (b) of § 766 of the Restatement previously quoted,

they are met with the fact that they have not shown that the defendant had knowledge of that business relation.

For the reasons above stated, the motion for a nonsuit should have been sustained. When it was overruled and a motion was made for a directed verdict, it should have been sustained.

RAND, C. J., and LUSK and KELLY, JJ., concur.