## Charles Snell v. The State.

*No. 3470.   Decided December 6.*

1. **Practice—Evidence—Dying Declarations.**—The written statement of a deceased made, reduced to writing, signed, and sworn to by him at a time when he did not apprehend death, though not admissible in itself, may become admissible in evidence when, as in this case. the deceased subsequently, conscious of approaching death, without hope of recovery, and sane, refers to and reaffirms the written statement so previously made.

2. **Same.** — It appears that although the said written statement was not shown to nor read over to the deceased at the time he reaffirmed it, it was proved that he fully understood the same, and that he referred to and adopted it at a time when he knew he was dying, and just before his death, and when he was requested to make a dying declaration. *Held,* that the statement was properly admitted in evidence as a dying declaration.

3. **Same.**—The defense proposed to meet the dying declaration by the testimony of one T., to the effect that the deceased made statements to him contradictory of the said dying declaration. But the witness being unable to state the substance of said variant statements, his proposed testimony was properly excluded as comprehending only his conclusions.

4. **Same.—A Bill of Exceptions** was reserved to the action of the trial court in rejecting testimony offered by the defense to impeach the credibility of a State's witness. Such testimony is admissible only after the establishment of a proper and sufficient predicate. The bill of exceptions shows no predicate for the proposed proof, and the said proof was properly excluded.

5.  **Self-Defense—Intent—Charge of the Court.**—The culpability of a defendant who interferes in an affray and slays in defense of another is measured by the intent with which he acted in interfering and slaying, and not by the intent with which such other engaged in the affray, unless it be shown that the defendant knew or might reasonably have known such intent.   See the opinion for the substance of proof *held* to clearly raise the issue of self-defense, and to have demanded of the trial court a charge upon that issue.

APPEAL from the District Court of Greer.   Tried below before Hon. G. A. Brown.

This conviction was for manslaughter under an indictment which charged the appellant with the murder of Joe B. Whitefield.   The penalty assessed was a term of two years in the penitentiary.

The proof shows that the deceased received the wounds which terminated fatally on Friday, May 23, 1890.   On Saturday, May 24, he made the statement in writing hereinafter set out as his dying declaration.   He died on Saturday, June 1, 1890.

The predicate upon which the statement was admitted in evidence as a dying declaration was established by the testimony of the State's witness Warren.   Warren testified that he was with the deceased on the day preceding his death.   Deceased's father and mother, Justice of the Peace Ice, and Mrs. Redding were present.   Mrs. Redding, at the dictation of 'Squire Ice, wrote a complaint charging the defendant and his brother Sam and his father, S. W. Snell, with an assault with intent to murder deceased.   The deceased signed and swore to that complaint before 'Squire Ice.   Deceased's father then asked him if that complaint stated the truth. Deceased replied:   "I have sworn to a statement before the officers before, and that statement is true.   I will never swear anything but the truth.   I have sworn to this once before, and I will make no more statements."   At this time the deceased was sane, but was expecting to die and had no hope of recovery.

Justice of the Peace Fletcher testified for the State that on the day after the cutting of the deceased he called on the deceased to take his written statement.   The deceased was then sane.   He did not say that he expected to die, but that as he did not know what might happen, he wanted to make his statement.   What he said was not said in answer to interrogatories calculated to elicit any particular statement.

The State then read the statement in evidence as the dying declaration of deceased.   It reads as follows:

"Charlie Snell and I had some words about his having torn down the gap in my fence, when Sam Snell came out and said, 'God damn you, jump on some one of your size.'   I then said, 'Get out here in the road.' He, Sam Snell, had a claw hammer in his hand.   I pulled a stick from the fence, and Sam Snell told me to put down the stick.   I told him to put down the hammer.   I then threw down my stick and he threw down

the hammer.    By this time old man Snell came to where we were and told Sam to go to the house.    Sam said, 'By God, I don't have to.'    He, Sam, then said I was a God damned liar, and I then came through the fence and called Sam a liar.    Sam then tried to get the stick that I had thrown down, and I ran against him and pushed him over the stick.    Sam then put his hand in his pocket to get his knife.    I then clinched his hand in his pocket, and as I did this Charlie Snell got the stick and aimed a blow at my head.    I let go of Sam to get the stick, and as I turned Sam Snell cut me in the back with his knife.    When he cut me in the back I fell.    After I fell and while I was on the ground Sam aimed a blow at my throat and I knocked the blow up and the knife struck me in the forehead.    He then cut me in the breast.    I then kicked him off of me with my feet, and as I rose he cut me on the shoulder.    I then looked around and Charlie Snell had started at me with his knife open, and old man Snell stopped him. I then saw that they were aiming to kill me and ran off.    I had no weapons to defend myself with but my fists.

"J. B. WHITEFIELD.

"Sworn to and subscribed before me this 24th day of May, 1890.

"E. R. FLETCHER,

"J. P. Prect. 1, Greer Co."

S. W. Snell, the father of the defendant, testified, in substance, for the defense that a few minutes before the cutting he, from a distance of about 125 yards, saw the deceased strike or strike at the defendant across the fence.    He went to that place at once and told deceased that he wanted no difficulty there.    Deceased said that the defendant had thrown down his gap.    Witness said to him, "If you will ask Maggie Snell, Mrs. Stinson, and Miss Alma Thornton you will find that Charlie did not throw down the gap."    Deceased replied, "If the women threw it down I have nothing more to say."    He then turned to the defendant and Sam Snell, called them damned sons-of-bitches, and proposed to whip them both if they would cross the fence.    Sam said to him, "I will show you that I am not afraid of you," and crawled through the fence into the lane.    Before Sam straightened up the deceased struck him; they clinched and fell, with the deceased underneath.    Deceased and Sam then got up.    Deceased ran at once for a club about twenty feet away.    Defendant ran for the club at the same time.    They met at the place where the club was lying, and deceased stooped to seize it.    At this time Sam closed in upon the deceased.    They clinched and fell, and at that instant the defendant got the club and threw it over the fence.    Witness was standing immediately behind the deceased when he, deceased, started to the club.    He then saw no blood on nor rent in the deceased's shirt.    As deceased rose from the ground after his second fall the witness saw that he was cut, and ordered Sam to stop, which Sam did.    Deceased then started home.    Witness, starting towards him, asked him, "Joe, are you hurt much?"    He

replied, "God damn you, don't you come about me!" Witness said to him, "I don't mean to hurt you, and I am very sorry this has happened." He then helped deceased to his house, put him to bed, and sent a boy for the doctor.

The defendant, in his own behalf, testified substantially as did his father, and in addition that he ran for the club at the time the deceased did for the purpose only of preventing the deceased from getting and striking his brother Sam with it. As soon as he got possession of the club he threw it over the fence, and made no attempt to use it on the deceased. He had no knife on his person, and made no attempt to use a knife on deceased. He did not draw a knife, nor even have a knife in his hand. He did not know that his brother Sam had a knife until after he saw that deceased was cut. He took no part whatever in the fight.

*D. G. Smith* and *W. B. Dunham,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.—We are of the opinion that the statements of the deceased, reduced to writing and signed and sworn to by him before the witness Fletcher, were properly admitted in evidence as dying declarations, it having been proved that the deceased was fully cognizant of said statements, and that afterwards, when he was conscious of approaching death, and was without hope of recovery, and was sane, he reaffirmed said statements. In Wharton's Criminal Evidence (9 ed.), section 287, it is said: "Prior declarations, though in themselves inadmissible, may become admissible on subsequent affirmation, in cases where, although the declarant did not at the time of first making them believe he was about to die, he subsequently referred to them and affirmed their truth at a time when he knew he was dying." See also Mackabee v. The Comm., 78 Ky., 380. It was not necessary, we think, that said statements should have been shown to or read over to the deceased at the time he reaffirmed the same, as it was clearly proved that he knew and fully understood the same, and he referred to and adopted them at a time when he knew he was dying and just before his death, and when requested to make a dying declaration.

It was not error to refuse to permit the witness Thornton to testify that deceased had made statements to him different from the dying declarations, said witness being unable to state the substance of said variant statements. To permit the witness to so testify would have been permitting him to state merely his conclusions.

Bill of exception No. 6 does not state facts which show that error was committed in rejecting the proposed testimony of the witnesses Stinson and Ridding as to statements made by Mrs. Whitefield. Said proposed

testimony would not be admissible except for the purpose of impeaching the credibility of Mrs. Whitefield as a witness, and the bill does not show that a proper predicate had been laid for the introduction of said testimony for said purpose. It was permissible for the defendant, in the cross-examination of Mrs. Whitefield, to lay a predicate for the purpose of impeaching her credibility by proof of statements made by her contradictory of her testimony, and if she denied making such statements it was then competent to prove that she had made them; but the bill of exception does not show that any predicate was laid.

We are of the opinion that the evidence fairly presents the issue of self-defense as to this defendant. It shows that defendant's brother was in an angry and violent struggle with the deceased; that deceased during the struggle attempted to possess himself of a club — a deadly weapon — with the apparent intention of using it upon defendant's brother, and it was at this juncture that the defendant interposed, secured the club, and struck or attempted to strike the deceased with the same. Up to this act of his it does not appear from the evidence that he engaged in any way in the difficulty between his brother and the deceased. It does not appear that he knew that his brother was using or intending to use a knife in the conflict. It does not appear that he knew or had reason to believe that his brother intended to kill the deceased or to inflict upon him serious bodily injury. On the contrary, the evidence tends to show that the appearances indicated to him that his brother and the deceased were merely engaged in a contest with their fists, neither using or attempting to use a deadly weapon.

Such being the state of the case, when the deceased attempted to possess himself of the club with the apparent purpose of using the same upon his brother, the defendant was justified in interfering in defense of his brother, and in securing the club, and even in striking or attempting to strike the deceased with it if necessary to prevent the deceased from getting and using it. It is not the intent which actuated the defendant's brother, but the intent with which the defendant acted which constitutes the criterion in passing upon the issue of guilt in this case. "According to his own act and intent does the law measure him and hold him guilty of murder, or of manslaughter, or entirely justifiable, as the facts may warrant," and the intent of his brother is immaterial unless it be shown that the defendant knew or might reasonably have known such intent. Guffee v. The State, 8 Texas Ct. App., 187; Sterling v. The State, 15 Texas Ct. App., 249; Dyson v. The State, 14 Texas Ct. App., 454; Foster v. The State, 8 Texas Ct. App., 248; Kemp v. The State, 11 Texas Ct. App., 174; North v. The State, 12 Texas Ct. App., 111.

In his charge to the jury the learned trial judge did not submit the issue of self-defense. No instruction whatever was given to the jury relating to self-defense, and because of the omission to submit said issue and to

properly instruct the jury in relation thereto, the charge of the court is fundamentally defective and insufficient (Bell v. The State, 17 Texas Ct. App., 538; Meuly v. The State, 26 Texas Ct. App., 274), and for this reason the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Hurt, J., absent.