# CASES

IN THE

# SUPREME COURT OF ALABAMA.

## NOVEMBER TERM, 1893.

## Johnson v. The State.

### Indictment for Murder.

1. *Drawing juries from incomplete list; venire quashed on motion.*— The provisions of the act "to more effectually secure competent and well qualified jurors," (Cr. Code, p. 132, note), relating to the drawing of petit juries by the jury commissioners of the several counties included in said act, are not merely directory, but mandatory; and, when in the discharge of their duties, the jury commissioners draw petit juries before a list of all the qualified jurors of their county has been completed and the names of all such jurors placed in the jury box, the drawing is illegal, and the *venire* of such petit juries should, upon proper motion, be quashed.

2. *Dying declarations; when admissible.*—To render dying declarations admissible in evidence, it is not necessary that they should be made when the declarant is in *articulo mortis*. The requirement of the rule is met if the declarations are made after the infliction of the mortal wound, and after all hope of recovery is lost by the declarant, and he realizes his impending dissolution.

3. *Same; rendered admissible by re-affirmance.*—Where declarations of a deceased, which were made to, written down by and sworn and subscribed to before a magistrate, when the declarant had not lost all hope of recovery, are re-affirmed as true and correct on the next day, when the declarant had given up all hope of recovery and realized his impending death, and while in possession of his reasoning faculties, such declarations are admissible in evidence notwithstanding they were not read over to him at the time of his re-affirmance of their correctness; a re-reading of the paper containing the declarations not being a necessary prerequisite to their admissibility.

4. *Same; res gestae.*—The statement by a deceased in his dying declaration, that he was in a room of his own dwelling pulling off his shoes when the defendant called him out and commenced the quarrel

1

[Johnson v. The State.]

which resulted in his death, is admissible in evidence as a part of the *res gestae*, tending to shed light on what was done, and as incident to the main inquiry. (McCLELLAN, J., dissenting on the ground that as between the killing and the fact that the deceased was in his own room pulling off his shoes when defendant called him out, there is no possible connection, either by way of cause, effect or incident, in such sort as to make it a part of the *res gestae*.)

5. *Evidence; when explanation of conflicting statement admissible.*—While uncommunicated motives and intentions are not admissible in evidence; yet where, after a witness for defendant has testified that he saw the difficulty in which defendant was the slayer, he admits, on being cross-examined with a view to impeachment, that he had previously stated that he knew nothing about the difficulty, it is competent for said witness, on being re-examined by defendant, to explain his motive in making such prior statement; such testimony tending to rebut the discredit his admission, unexplained, would throw upon his evidence.

6. *Ruling of trial court in excluding showing of absent witness's testimony; when conclusive.*—Where the State's counsel admitted that certain absent witnesses for defendant would, if present, testify as set forth in separate written affidavits, and upon the defendant offering during the trial to introduce the affidavit setting forth the testimony of one of the absent witnesses, the "court decided that the State's counsel did not agree to admit the showing as to such witness," and excluded the affidavit, the trial court's ruling in this behalf is conclusive, and will not be disturbed on appeal.

7. *Court without power to continue a cause of its own motion; when defendant can not complain of such ruling.*—After the trial of a cause is entered upon, the court has no power, of its own motion, to continue the cause; and a defendant failing to make a motion for continuance can not afterwards complain that the trial was conducted to an end.

8. *Charges to the jury; restriction of inquiry to only part of the evidence.*—Charges to the jury which demand the acquittal of a defendant, if the jury believe the evidence of the defendant and his witnesses, are misleading and properly refused, in that they restrict the consideration of the jury to only a part of the evidence, when they should, in making up their verdict, consider all the evidence together.

9. *Same; presumption when there is conflict in the evidence.*—A charge that instructs the jury that "the presumption is in favor of defendant on each material question as to which there is conflict in the evidence," is misleading and properly refused.

10 *Same; evidence of good character.*—In a criminal case, evidence of good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt; but charges that instruct the jury that good character, if proven, may be considered by them "for the purpose of generating doubt," or that "good character, when established by the evidence, may alone generate a doubt of defendant's guilt, even though a reasonable doubt of defendant's

guilt may not exist otherwise," assert incorrect propositions of law, and are properly refused.

11. *Same; words of provocation do not reduce murder to manslaughter.* Mere words of provocation, however insulting or offensive, can never reduce homicide from murder to manslaughter; and a charge, that instructs the jury that words of provocation may be sufficient to arouse passion to such a degree as that a homicide committed under its influence can not be murder in either degree, asserts an erroneous proposition of law, and is properly refused.

12. *Same; when two suppositions, hypotheses or theories may be drawn from the evidence.*—Charges that instruct the jury that if two "suppositions," "hypotheses" or "theories" "may be drawn" or "may arise" from the evidence, the one consistent with the defendant's innocence, and the other tending to establish his guilt, the defendant should be acquitted, are erroneous and should be refused.

13. *Same; freedom from fault in provoking or encouraging the difficulty.*—Freedom from fault in provoking or bringing on the difficulty is an essential element of self-defense; and an instruction to the jury that postulates defendant's right of acquittal upon his being "properly and reasonably free from fault in provoking or encouraging the difficulty," does not require the establishment of this essential element of self-defense, and is properly refused.

14. *Same; reconciling conflict in the evidence.*—A charge that instructs the jury "that, in passing on the evidence, if the jury finds the evidence is in conflict on any particular, it is the duty of the jury to reconcile the conflict, if it can, favorably to the defendant," is erroneous in requiring the jury to do more than they *reasonably* can, in their efforts to reconcile any conflict in the evidence, and is properly refused.

APPEAL from the Criminal Court of Jefferson.

Tried before the Hon. SAMUEL E. GREENE.

The appellant was indicted and tried for the murder of John W. Kimbro, was convicted of murder in the second degree, and sentenced to the penitentiary for 25 years.

The facts pertaining to the ruling of the trial court upon the motion to quash the venue of the petit jurors, which had been drawn and summoned for the week during which the defendant was placed upon trial, are sufficiently stated in the opinion.

The State introduced testimony tending to show that the defendant and Kimbro, at the time of the latter's death, lived in adjoining houses in the city of Birmingham; that on Friday, June 11th, 1892, between half

past seven and eight o'clock, when the deceased was preparing to retire for the night, the defendant, who was coming down the street upon which they both lived, stopped in front of the deceased's gate, and asked if the deceased was at home, and upon being told that he was, the defendant stated that he wanted to see him; that the said Kimbro came out of his house in his shirt sleeves and sock feet, having pulled off his shoes, and went out to the front gate; that there they got into a dispute about a quarrel that had taken place between their respective wives; that the defendant accused the deceased's wife of commencing the quarrel, which the deceased denied, and said, "I beg pardon, my wife said she slept in the room with the servant." The defendant said in response to this, that she did not. During the course of the quarrel the deceased spoke of his having been treated badly by the defendant's wife when he asked for a key, and said, "I don't think any true lady would give a gentleman such an abrupt answer as she did to me when I asked her for the key." To this remark defendant replied, "Do you mean to say that my wife is not a lady?" The deceased said "No"; and thereupon the defendant struck him with an umbrella he had in his left hand, and shot him, from the effects of which wound the said Kimbro died on the following Monday morning.

One of the witnesses for the State testified that about 12 o'clock Saturday, after the said Kimbro had been shot, he was in the room at the bed-side of deceased, with his wife and others, and that they were talking about the deceased dying, and "his wife said that the doctor said there was no more than one chance in ten for him to get well, and deceased went on speaking about dying, and wanted to make a statement," and asked the said witness to get a justice of the peace. The same witness further testified that after the receipt of a telegram from his father, saying that he would be there the next morning, the deceased spoke about "not living to see his father;" and that upon the justice of the peace coming to the house to take his statement, and asking the deceased how he felt, he replied, "I feel very badly; and that he could not last much longer." It was also in evidence that the deceased said on Saturday before the statement was made, "I will never get up from here."

Upon the introduction of John S. Kennedy, Esq., a

notary public and justice of the peace in and for the county of Jefferson, State of Alabama, he testified "that on the Saturday after the shooting he was called to take the statement of the deceased; that he went to his house and found him in bed, and he took the statement down in writing; that after he had gotten through, and while he was writing over the statement, witness suggested to the deceased whether there was anything else he had neglected to state, and he said yes, and the witness went back, and he made some other statements." The witness Kennedy further testified that on Sunday afternoon, he went back to the house of the deceased for the purpose of taking the statement over again, or having it re-affirmed by the deceased; that he stated, on being asked how he felt, "I don't think I can live long," or, "I don't think I can stand it long." That the witness then asked deceased if he remembered making the statement on the day before, holding up and unfolding the paper, and that the deceased replied that he did very distinctly; that thereupon the witness asked him "If it was necessary for him (witness) to read it over to him again?" and he said, "No, I remember every word of it," and the witness asked him if he would reiterate the statement, and he said, "Yes, every word of it is true." Without re-stating or re-writing any part of the written statement, the witness then endorsed in pencil at the foot of the declaration, "Statement re-affirmed by Kimbro, June 12th, 5:30 p. m. J. S. K."

The State then introduced in evidence the dying declaration of the deceased, which the witness Kennedy had testified was made before him and reduced to writing by him. The defendant objected to the introduction of the statement in evidence, on the grounds, 1st, that it was not legal testimony; 2d, that the same was hearsay evidence; 3d, that no sufficient predicate had been laid for the introduction of said statement in evidence; 4th, that the evidence failed to show that such written statement was the dying declaration of the deceased; and, 5th, that the evidence failed to show a sufficient predicate for allowing the introduction of said statement as the dying declaration of the deceased. The court overruled this objection, allowed the statement to be introduced in evidence, and the defendant duly excepted. This statement signed, sworn and subscribed to by the deceased before the said J. S. Kennedy, as

[Johnson v. The State.]

notary public and *ex-officio* justice of the peace, was as follows: "Personally appeared before me, J. S. Kennedy, N. P. and *ex-officio* J. P., J. W. Kimbro, who being duly sworn, deposed and said that I consider my condition very uncertain. I may, and I may not recover. Last night about 7:45 p. m. I was in my house taking off my shoes to retire, when A. R. Johnson called at my front gate and asked my wife if I was in. She said yes, and he asked her to tell me to please come out, that he wanted to see me, and my wife told me, and I went out after having removed my shoes. I stopped on the inside of my yard, and he remarked that Johnson was his name. He asked me to come outside as he wanted to see me. I just stepped outside of the gate and he said that my lady had been abusing his lady in a way that he did not like. I asked him which of the two began the trouble and he remarked it was your lady, and I told him that I begged his pardon, it was not. He said that my wife told his, that she was intimate with a negro servant that he had, as she was with himself. This I told him was not true ; that is, that my wife did not tell his wife any such thing. He then asked me what she did tell his wife, and I told him that my wife told his wife that she slept in the room with this negro servant. Then he said that his wife did not do any such thing. I asked him if he knew what his wife told me when I went and called upon her to ascertain if she knew anything of the key to my house, and she told me that she knew nothing at all about it, speaking in a very abrupt tone. I told him that I did not consider that any true lady would give a gentleman such an abrupt answer to a civil question. Johnson said, do you mean to say that my wife is not a true lady, to which question I answered no. At the same time Johnson striking me with his umbrella which was in his left hand and shooting me with a pistol which was in his right hand—firing two shots, the first taking effect about four inches below and to the left of the left nipple, and coming out under my left shoulder blade. The second and last shot did not take effect at all. After I had recovered sufficiently to get upon my feet, this first shot having knocked me down, Johnson walked out in front of me and asked me 'Do you want any more, you son of a bitch?' to which I made no response. I failed to state that when I first went out, and after he told me who he was, that I told him that I did not want to have

any trouble with him, and further that I did not care to meddle with women's business.''

The defendant moved to exclude the whole of the said written statement as introduced, and duly excepted to the court's overruling his motion. The defendant then objected to the introduction of, and moved to exclude the following part of said statement: ''I was in my house taking off my shoes to retire, when A. R. Johnson called at my front gate and asked my wife if I was in. She said yes, and he asked her to tell me to please come out that he wanted to see me, and my wife told me, and I went out after having removed my shoes.'' The court overruled this motion of the defendant, and the defendant duly excepted. The defendant then moved to exclude each separate clause and sentence of the part of the statement just quoted, and separately excepted to the court's overruling each of his motions.

The testimony for the defendant tended to show that on the night of the shooting, as he approached the dwelling of the deceased, the latter was standing at his gate, and after saluting defendant, said to him, ''Your wife is cutting up around here too much, and is talking too much about my wife,'' and that the defendant replied, that ''from what I hear, your wife is doing the talking;'' that the deceased said that what his wife said was true; that thereupon the defendant stated to the deceased, ''Your wife said that my wife is sleeping with a negro man,'' that upon the deceased saying it was true, the defendant called him a liar, and the deceased struck at the defendant; that the defendant dodged the blow, and the deceased struck at him again, knocking him down off the side walk into the gutter; that the deceased started to the edge of the side-walk and put his right hand behind him as if to draw a pistol, or weapon, and, thereupon the defendant drew his pistol and shot the deceased while he, the defendant, was in a stooping position, and before he had recovered from his fall in the gutter. The defendant also introduced evidence showing that his general character was very good, and his character for peace was very good.

All the other facts of this case are sufficiently stated in the opinion.

The defendant requested the court to give to the jury the following written charges, and separately excepted to the court's refusal to give each of them as asked: (1.)

"If the jury believes the evidence of the defendant and of the defendant's witnesses, they should find the defendant not guilty." (2.) "The court charges the jury that if they believe the evidence of the defendant and of the defendant's witnesses, the defendant did nothing to bring on the difficulty." (3.) "The court charges the jury that if they believe the evidence of the defendant and of the defendant's witnesses, the defendant did nothing to bring on the difficulty, and no duty of retreat rested on, or by the law was required of, him." (4.) "If the jury believe the evidence of the defendant and defendant's witnesses, the defendant did nothing to bring on or provoke the difficulty, so as to; under the law, deprive the defendant of his claim or defense that he acted in self-defense." (5.) "The court charges the jury that the presumption is in favor of defendant on each material question as to which there is conflict in the evidence." (6.) "The good character of the defendant, if proven, is not only evidence of innocence, but it may be considered by the jury for the purpose of generating doubt." (7.) "That if the jury believe from the evidence that the defendant did not shoot the deceased with malice, but on account of sudden passion aroused by deceased reiterating a charge made by deceased's wife, if you believe from the evidence such charge was made, that the defendant's wife slept with a negro, the defendant would not be guilty of murder in either degree." (8.) "The court charges the jury that good character, when established by the evidence, may alone generate a doubt of the defendant's guilt, even though a reasonable doubt of defendant's guilt may not exist otherwise." (9.) "Charge the jury that if from the evidence two suppositions may be drawn, one consistent with the defendant's innocence, and the other with his guilt, the defendant should be aquitted." (10.) "If the jury believe from the evidence that the defendant was properly and reasonably free from fault in provoking or encouraging the difficulty, and that at the time the fatal shot was fired there was reasonable ground for apprehending present and impending peril to his life, or of great bodily harm, and defendant so believed, and it so reasonably appeared to him, and that there was, and it so reasonably appeared to him, no probability of escape without increasing his danger, then the jury should acquit; and if from the

whole evidence the jury have a reasonable doubt as to
whether the defendant acted in self-defense or not, then
the jury should acquit the defendant." (11.) "The
court charges the jury that if two hypotheses, or theo-
ries arise from a consideration of the testimony, one in-
dicating the defendant's guilt, the other his innocence,
the defendant should be acquitted." (12.) "The court
charges the jury that if two theories arise from the evi-
dence, one consistent with the defendant's innocence and
the other with his guilt, it is the duty of the jury to
adopt the theory consistent with his innocence, and ac-
quit the defendant."

J. J. ALTMAN, G. W. HEWITT and CHARLES . G.
BROWN, for appellant.—The provisions of the jury law,
which pertain to Jefferson county, relating to the duties
to be performed by the jury commissioners in the draw-
ing of juries, are not directory but mandatory.—Cr. Code,
p. 132, note ; Lowe v. State, 86 Ala. 47 ; Wells v. State,.
94 Ala. 1 ; Forney v. State, 98 Ala. 19.

The several exceptions to the dying declarations of-
fered in .evidence, and the motions to exclude the
several parts thereof should have been sustained. Be-
fore dying declarations are admissible inevidence,
the court must be clearly convinced that at the
time the declarations were made the deceased had no
hope of recovery.—6 Amer. & Eng. Encyc. of Law, pp.
108, 114, 115, 128 ; 36 Amer. Rep. 30 ; 1 Greenl. on Ev-
idence, (1st Ed.) 158 ; Tracy v. The People, 97 Ill. 101 ;
People v. Gray, 61 Cal. 164 ; Rex v. Van Butchell, 3 C. &
P. 629 ; Errington's Case, 2 Lew. (Eng. C. C. Rep.) 148 ;
People v. Hodgdon, 55 Cal. 76 ; Justice v. State, 99 Ala.
180.

The evidence is not sufficiently clear and convincing
that at the time of the alleged re-affirmance of his former
declarations, the mental condition of the deceased and
his belief in the certainty of his death was sufficient to
render the statements admissible in evidence.—Wharton
on Crim. Ev., pp. 276, 287 ; Young v. Commonwealth,. 6
Bush. (Ky.) 317 ; State v. McEvoy, 9 S. C. 208 ; Mockabee
v. Commonwealth, 78 Ky. 380 ; Snell v. State, 15 S. W.
Rep. 723 ; Tracy v. People, 97 Ill. supra ; Justice v. State,
supra.

Charges 7 and 10 asked by the defendant should have
been given.—Hooks v. State, 99 Ala. 166 ; Storey v. State,
71 Ala.. 336 ; Smith v. State, 68 Ala. 430,

Wм. L. Martin, Attorney General, *contra.*—Under the provisions of the 17th section of the jury law, that "all laws now in force in relation to juries, their drawing, selecting or qualification, not in conflict with this act, are hereby continued in full force and effect," section 4314 of the Code which declares that the provisions of the Code "relating to the selection, drawing and summoning of jurors are merely directory" is applicable; and the provisions of the jury law, (Cr. Code, p. 132, note), providing for the drawing of juries by the commissioners are merely directory.—*Jackson v. State,* 76 Ala. 26. "The law of this country is confidently believed to be that while a challenge of an array will not be sustained merely because of a deficiency of the list from which it was drawn, yet the rule is otherwise where that deficiency is the result of fraud, or of manifest prejudice against prisoners about to be tried." Thompson & Merritt on Juries, §§ 139, 140; *People v. Tweed,* 59 How. Pr. (N. Y.) 280; *Dolan v. People,* 64 N. Y. 485; *Com. v. Walsh,* 124 Mass. 32; *Maffett v. Tonkins,* 6 N. J. L. 228; *Reeves v. State,* (Fla.) 10 So. Rep. 901; *State v. Taylor,* (La.) 11 So. Rep. 132.

An irregularity in the drawing of juries, which does not affect the rights of the prisoner, or is a departure from the provisions of a statute, which works no injury to the party accused, is not a ground of challenge, or an objection to the whole array.—Proffat on Juries, § 154; *Bales v. State,* 63 Ala. 30.

The dying declarations having been re-affirmed at the time when the deceased was under a sense of impending dissolution, were properly admitted in evidence.—Whar. Cr. Ev., (9th Ed.) § 287; 1 Roscoe's Cr. Ev., (8th Ed.) p. 57, note 2; *Reg. v. Steele,* 12 Cox C. C. 168; *Young v. Com.* 6 Bush. (Ky.) 312; *Mockabee v. Com.,* 78 Ky. 380; *Snell v. State,* 29 Tex. App. 236; 15 S. W. Rep. 722; *State v. McEvoy,* 9 S. C. 208; 1 Greenl. Ev., (15th Ed.) 228, 9 note a.; 6 Amer. & Eng. Encyc. of Law, p. 116. Charge 7 asserted an incorrect proposition of law, and was, therefore, properly refused.—*Reese v. State,* 90 Ala. 624; *Ex parte Sloane,* 95 Ala. 22.

Evidence of good character alone is not sufficient to generate a reasonable doubt, as seems to be asserted by the 6th and 8th charges refused.—*Pate v. State,* 94 Ala. 14; *Johnson v. State,* 94 Ala. 35.

The 10th charge misplaces the burden of proof of self-

defense, and for that reason, as well as others quite ap-
parent upon its face, was properly refused.—*Roden v.
State*, 97 Ala. 54; *Cleveland v. State*, 86 Ala. 1.

STONE, C. J.—Before entering upon the trial of this
case upon its merits, the defendant, by his counsel,
moved to quash the *venire* of the petit jury which had
been drawn and summoned for the, then, present week
of the term. We mean the regular panel drawn and
summoned to do jury service for that week; not the jury
specially drawn to complete the number required in cap-
ital cases. Several grounds were assigned in support of
the motion, but only one is insisted on here, namely,
that when the names were drawn, the work of determin-
ing who were suitable and qualified persons to do jury
service in the county had not been completed by placing
their names in the box, and that, consequently, the
names composing the panel were drawn from an imper-
fect list of names. The *venire* for summoning these
jurors was issued March 8, 1893, and the drawing must
have taken place before that time. The term of the
court, as fixed by law, would commence early in April,
and the drawing must needs take place about the time
it did, to meet legal requirements.

The facts attending the drawing were shown by the
undisputed testimony of the president of the jury com-
mission, and were as follows: "The jury commission
met the day after the adjournment of the last term of the
court of county commissioners for the year 1892, and
commenced their duties as jury commissioners, and ad-
journed from time to time until the 30th day of March,
1893. The jury commission found it necessary to draw
the *venire* in this case from the box containing all the
names of qualified jurors of the county which had been
selected and put upon the list at the time of the drawing
of said *venire*; and that the selection and list were only
partially made, and had not been completed at the time
of the drawing of said *venire*, and at the time it was re-
ceived by the clerk of the court; and that said selection
and list were not completed until the 29th day of March;
and the certified copy thereof was filed in the office of
the judge of probate on the 30th day of March, 1893."

For several years Jefferson has been a mining and
manufacturing county, and it is common knowledge that
in such communities population is more or less variable.
To obtain a complete census of such county, or of any

county, at any given time, would require time as well as
labor.   But the work is not done when the census roll is
made out.   The jury commission select from that list
such persons, as in their judgment, possess the requisite
qualifications for jury service.   They must then prepare
a list of the names so selected, "stating thereon the
place of residence and occupation of each person, if
known to them, and shall file a certified copy of such list
in a sealed envelope, in the office of the judge of probate,
within five days after making such selection."   They
must also "write the name of each person therein con-
tained, with his place of residence and occupation, if it
appears from the list, on a separate piece of paper, and
must fold, or roll up such piece of paper, as nearly as
may be in the same manner, so that the name may not
be visible, and deposit the same in a box, which must
be secured by sufficient locks and seal."   Code of 1886,
Vol. 2, p. 132, §§ 3 and 4 in note.   This is a summation
of the duties the law casts on a jury commission, all of
which must be performed before the service is complete.
Suppose the county contains ten or twenty thousand
resident freeholders or householders.   It must needs re-
quire days and weeks to complete the service.   Suppose
a regular court, established by law, comes on in the
meantime, and must have juries.   Must the wheels of
justice stand still until the jury box is completely filled
up?

Another thought:   When the jury box is once filled
to be drawn from, the law makes no provision for refill-
ing the box until all the names are drawn out.   The in-
tention and purpose of this legislation were to equalize,
as far as could be accomplished, the burden of jury ser-
vice among all the persons qualified therefor.   It is not
regarded as an occupation to be sought after.   Now,
when many drawings have been made, and the number
of names left in the box has become relatively small, it
follows necessarily that in trials had in these conditions
the jury must be drawn from the reduced number left in
the box.   It would be difficult to formulate an argument
that the accused had been denied a legal right in this
case, which would not include in its condemnation all
organizations of juries, if accompanied with the attend-
ants we have supposed.   The argument proves too
much.

[Johnson v. The State.]

What we have written relates to the *rationale* of the principle. To enforce the rule, as contended for, would frequently lead to delays, if not to a denial of justice. We think, however, that the statutes themselves, and many well considered opinions of courts of high character sustain the ruling of the criminal court on this question.—Code of 1886, § 4314; Jury law approved February 28, 1887, § 17, Sess. Acts, p. 158, Code of 1886, Vol. 2, page 135 in note; Act approved February 11, 1891, Sess. Acts, p. 561; *Bales v. State,* 63 Ala. 30; *Jackson v. State,* 76 Ala. 26; *People v. Tweed,* 50 How. Pr. 280, (seems to be directly in point); *Dolan v. People,* 64 N. Y. 485; *Com. v. Walsh,* 124 Mass. 32; *Maffett v. Toukins,* 6 N. J. Law 228; Proffatt, Juries, § 154; *Reeves v. State,* 10 So. Rep. 901; *State v. Taylor,* 11 So. Rep. (La.) 132. See also *Gray v. State,* 55 Ala. 86; *Commander v. State,* 60 Ala. 1; *Kimbrough v. State,* 62 Ala. 248; *Roberts v. State,* 68 Ala. 515; *Redd v. State,* 69 Ala. 255; *Gibson v. State,* 89 Ala. 121.

We do not wish to be understood as saying that in no case should the array or *venire* be quashed because drawn from an incomplete list. If the process of filling the box had been carried to only a very limited extent, or if any circumstance attending the drawing gave evidence that it had not been fairly and impartially conducted, we will not say the presiding judge should not quash the *venire.* The right of trial by an impartial jury is a constitutional privilege, sanctioned by long observance, and should at all times be jealously guarded as one of the essential safeguards against the abuse of official power. But such abuse is not presumed. It must be shown, to authorize the imputation of error.

The most severely contested question in this case arises out of the admission in evidence of what is claimed to have been the dying declaration of the deceased. The mortal wound was inflicted Friday night. On Saturday the declaration was carefully written by a justice of the peace, from statements made by the wounded man, and in his presence. It was then read over to declarant, some alterations or additions made to it at his suggestion, then signed by him and sworn to before the justice, and certified as being sworn to. Declarant had not then lost all hope of recovery. On Sunday evening the justice of the peace called to the attention of the

[Johnson v. The State ]

wounded man the statement he had made and sworn to the day before, and asked him if the same was true. He answered, "Yes, every word of it." The paper was not then re-read to the declarant, nor was anything done save what is stated above. He died about noon on the next day, Monday.

We can not doubt, in view of the testimony, that when Kimbro, the wounded man, made the reply on Sunday evening that the statement was true, "every word of it," he had then lost all hope of recovery. Many expressions of his, and his really desperate condition prove this. It is not required that the declaration should be made in *articulo mortis*. It is enough that it be made after the infliction of the mortal wound, and after all hope of recovery is surrendered. Such is the rule in this State.—*Hammil v. State*, 90 Ala. 577 ; 3 Brick. Dig., 226.

When the declaration was made, written down and sworn to, Kimbro had not lost all hope of recovery. The declaration proves this to be true. It is shown, however, that when, on the next day, Sunday, he affirmed the truth of the statement previously made, he had then given up all expectation or hope of recovery. It is objected to the legality and sufficiency of this testimony that the paper containing the declaration was not then re-read to him, before he asserted its truth. This precise question has been many times presented, and the ruling has been that a re-reading is not a necessary prerequisite to its admissibility in evidence. Sufficient that the declarant retains his reasoning faculties, and affirms the correctness of the statement made, after he has given up all hope of recovery.—6 Amer. & Eng. Encyc. of Law, 116-7 ; Whar. Cr. Ev., § 287 ; *Reg. v. Steele*, 12 Cox. Cr. Ca. 168 ; *Young v. Com.*, 6 Bush. (Ky. Rep.) 312 ; *Mockabee v. Com.*, 78 Ky. 380 ; *State v. McEvoy*, 9 Rich. (S. C.) 208 ; *Snell v. State*, 29 Tex. Ct. of App.236 ; s. c. 15 S. W. Rep. 722 ; *People v. Hodgdon*, 55 Cal. 72 ; *People v. Gray*, 61 Cal. 164.

There were several motions made to exclude parts of the declaration, as not being sufficiently connected with the act of killing to justify their admission as parts of the *res gestae*. Each of these motions was overruled, and separate exceptions were reserved to each ruling. The portions which defendant moved to exclude were decedent's statement as to where he was, and what he

was doing, when, as he testified, the defendant called him out and commenced the quarrel. The substance of his statement was, that he, decedent, was in the room (of his own dwelling,) and was in the act of pulling off his shoes, when the defendant called him out; and that as soon as he got his shoes off, he went out to the gate, and there met the defendant, who commenced the quarrel, and very soon shot him, inflicting the mortal wound. All this, if believed, tends to prove that deceased was in his own dwelling, was exhibiting no hostile design, was neither desiring nor expecting a difficulty, was making no preparation for it, and that defendant took the initiative, which resulted almost immediately in the angry altercation and the homicide.

Defendant testified that he was passing the gate of deceased, that the latter, standing at his gate, hailed him, and immediately commenced the angry altercation. All the testimony agrees that the quarrel was very brief, and that the pistol shot followed very quickly upon the meeting. These two accounts presented a well defined and striking issue of fact for the jury to solve. Presented as this issue was—in fact, in every conceivable case, in which it becomes material to ascertain the matter of bringing on a difficulty—the position, occupation, conduct and manner of the respective parties at the time the quarrel had its inception, are pertinent circumstances to be weighed in determining who was the aggressor. They shed light on what was done, and are incidents of the main fact. That is the true test.—21 Amer. & Eng. Encyc. of Law, 99, and notes.

If there had been a motion to exclude the words, uttered by declarant, in which he stated his purpose in pulling off his shoes—"to retire"—and if the motion had been confined to these words alone, we will not say it should have been refused. These simply expressed his own mental purpose, were not given expression to, and could shed no light on the main inquiry. But there was no motion made to exclude these words alone. Each motion asked the exclusion of some asserted fact which tended to show where deceased was, and what he was engaged in, at the very time he was called out. The entire statement objected to, and each part of it, save that which expressed his intention in pulling off his shoes, were material and pertinent to the inquiry, as to

what was his attitude, posture and occupation when, as he stated, he was called out by defendant, and as to who brought on the quarrel which resulted in the homicide. There was no error in this ruling.—*Fonville v. State*, 91 Ala. 42; *Johnson v. State*, 94 Ala. 35; *M. & M. R. R. Co. v. Ashcraft*, 48 Ala. 15, 31; *Ala. Gr. So. R. R. Co. v. Hawk*, 72 Ala. 112; *L. & N. R. R. Co. v. Pearson*, 97 Ala. 211.

McCoy was examined as a witness for the defendant, and testified that he saw the encounter in which Kimbro lost his life. He testified favorably to the defendant. He was asked by the prosecution, with a view of assailing his testimony, if he had not said in the presence of one Hamilton that he knew nothing about the difficulty. He answered that he had. To counteract any effect this might have on the weight to be given his testimony, he was asked by the defendant to state the reason why he made said statement, and was proceeding to state that his reason was that he "did not want to talk about the subject at all." On motion of the prosecution, this and other similar questions and answers were ruled out, and defendant excepted. It is the rule of this court, many times asserted, that uncommunicated motives or intentions will not be allowed to be proved, as a means of weakening or imparing the force of conduct or conversation proved, which, unexplained, tends to prejudice the claim set up, or attempted to be established. We think our rule a good one, although in many States the rule is otherwise. The trial court did not err in excluding the testimony.—*McCormick v. Joseph*, 77 Ala. 236; *Whizenant v. State*, 71 Ala. 383; *Burke v. State*, 71 Ala. 377; *Brewer v. Watson, Ib.* 299; *Brown v. State*, 79 Ala. 51; *Harrison v. State*, 78 Ala. 5.

There was a motion made by the defendant for a continuance on account of absent witnesses, with separate written affidavits setting forth what they were severally expected to prove. There was an admission that witnesses, if present, would testify as therein set forth. As to one of the absent witnesses, Crowell, whose name was also embraced in the showing, there was a misunderstanding, but it was not discovered until the affidavit setting forth his testimony was offered in evidence, and, on motion of the prosecution, ruled out The testimony pertaining to the admission is set out, that given against,

[Johnson v. The State.]

as well as that which tended to show that the testimony
of Crowell was included in the agreement to admit.
We need not set out the details. The trial "court de-
cided that the State's counsel had not agreed to admit
the showing as to the witness Crowell." That is con-
clusive with us, and we feel bound to hold that the crimi-
nal court rightly decided that the affidavit setting forth
what Crowell would testify, if present, was not agreed
to be admitted, and that the court did not err in refusing
to let it in. This ruling appears to have been had after
the trial had progressed for several days. What could
then be done to repair the injury?

Counsel for the defendant, after consultation, declined
to move that the case be taken from the jury and con-
tinued, "but wished to submit whether it was not the
duty of the court, of its own motion, to continue the
cause." In reply to this, "the court stated that, at this
stage of the trial, the court had no right of its own
motion to continue the cause."

We need not decide whether, if the defendant had
moved to take the case from the jury and continue it, it
would not have been legal and proper to do so. As a
rule, no one can object to a judicial ruling which is rend-
ered at his request. But no such motion was made.
Clearly the court had no power of its own motion to
make such order; and if it had done so, the defendant,
would have been entitled to his discharge. He made no
motion, and can not be heard to complain that the trial
was conducted to the end.—*Ned v. The State*, 7 Por. 187;
*McCauley v. The State*, 26 Ala. 135 ; *Henry v. The State*, 33
Ala. 389 ; *Ex parte Vincent*, 43 Ala. 402 ; *Bell & Murray v.
The State*, 48 Ala. 684 ; *McGehee v. The State*, 58 Ala.
360 ; *Hawes v. The State*, 88 Ala. 37.

Arising, as this question did, while the trial was in
progress, the only recourse open to the defendant after
the verdict was rendered, would have been a motion for
a new trial, on account of the misunderstanding and
consequent surprise. No such motion appears to have
been made, and we need not speculate as to what would
or should have been its fate, if it had been made.

Other questions were raised pending the introduction
of the testimony, but we think there is no merit in
them.

Thirteen written charges were severally asked by de-

fendant, severally refused, and a separate exception reserved to each refusal. The first four of these charges assert substantially the same proposition. They sought to have the inquiry narrowed to the testimony of the defendant and his witnesses, if the jury believed their evidence. Such charges are always objectionable, because they tend to restrict the inquiry the jury should make to only a part of the testimony. Before rendering a verdict the jury should consider and weigh all the testimony, and render to each part of it its due weight and value in the general make up of the verdict.—3 Brick. Dig., 111, § 83. These charges were calculated to mislead, were to some extent an argument, and were rightly, refused. The same comment may also be made, in part, on charge 5.

Charges six and eight assert the broad, naked proposition, that good character alone may generate a doubt of defendant's guilt. These charges are faulty in two respects. They employ the single word *doubt*, instead of *reasonable doubt*, which the rule requires. Second, they assert broadly that proof of good character may generate a doubt. The charge, to meet the requirements of the rule, should have been that "good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt," &c.—*Pate v. State*, 94 Ala. 14; *Johnson v. State*, 94 Ala. 35. These charges were rightly refused.

Charge seven asserts, that mere words of provocation may be sufficient to arouse passion to such a degree, as that a homicide committed under its influence can not be murder in either degree. This is not the law.—*Reese v. State*, 90 Ala. 624; *Ex parte Sloane*, 95 Ala. 22.

Charges 9, 11 and 12 employ severally the words, "suppositions," "hypotheses" and "theories," and assert if two of them "may be drawn," or "may arise," out of the testimony, one consistent with the defendant's innocence, and the other tending to establish his guilt, the defendant should be acquitted. These charges are faulty in several respects. Supposition has no legitimate sphere or habitation in judicial administration. So, in the connection in which they were invoked, the words hypotheses and theories have very doubtful and indefinite significations It is certainly the law that if the testimony in its weight and effect be such, as that two

conclusions can be reasonably drawn from it, the one favoring the defendant's innocence, and the other tending to establish his guilt, law, justice and humanity alike demand that the jury shall adopt the former, and acquit the accused. In such condition the guilt is not established or proved beyond a reasonable doubt. This, at last, is the true test. Each of these charges was rightly refused.

Charge 10 sets out with the postulate that if the accused was "properly and reasonably free from fault in provoking, or encouraging the difficulty," &c. On this postulate it claims an acquittal. The charge was rightly refused. To invoke the doctrine of self-defense, the slayer must be without fault in provoking, or bringing on the difficulty. This doctrine is too important, too conservative of human life and of good order, to allow it to be frittered away.—*Storey v. State*, 71 Ala. 329, 336, and citations; *McDaniel v. State*, 76 Ala. 1; *Kirby v. State*, 89 Ala. 63; *Watkins v. State*, *Ib*. 82.

Charge 13 seems to be incomplete, but we must deal with it as we find it. Its language is, "That in passing on the evidence, if the jury finds the evidence is in conflict on any particular, it is the duty of the jury to reconcile the conflict, if it can, favorably to the defendant." Not to notice any other clause of the charge, the word *reasonably* ought to have been inserted, as a qualification of the attempted duty to reconcile. If they reasonably can, is the extent of their power and duty, and they should not attempt any reconciliation which is not reasonable, and justified by the language employed. This duty to reconcile, if they reasonably can, is due alike to the State and to the accused. It is due to the solemn oaths the jurors take. It is faithfully and honestly discharged when giving fair play to their reasoning faculties, and according to the accused the benefit of every reasonable doubt which arises out of the testimony, or its omissions, their verdict is the honest expression of the effect the testimony has produced on their minds and judgments, under the law as delivered to them in the charge of the court. This charge is imperfect, would have tended to mislead, and was rightly refused.

Affirmed.

McCLELLAN, J., dissents from so much of the fore-

[Johnson v. the State.]

going opinion as holds that the fact that deceased was in his room pulling off his shoes when the defendant came to his house is a part of *res gestae* of the homicide. He can see no possible connection between the killing and this fact, either by way of cause, effect or incident, in the sense necessary to its incorporation in the *res gestae* of the transaction. He thinks the judgment should be reversed because of its admission as a part of the deceased's dying declarations. As an independent fact it might have been competent coming from the mouth of a witness on the inquiry of fault in bringing on the difficulty, but it was not so adduced.

RESPONSE TO APPLICATION FOR REHEARING. (MAY 15TH, 1894.)

HARALSON, J.—We are satisfied with the opinion delivered heretofore in this case, by the late Chief Justice, Stone, except in the particulars we now proceed to notice. The facts on the questions we refer to need not be restated, further than to explain more fully the views we now take, different from those announced in the former opinion.

FIRST. In our former opinion, we held that the court committed no error in ruling that the witness, McCoy, could not be allowed, on rebutting examination by defendant, whose witness he was, to explain his motive in telling the State's witness, Hamilton, that he knew nothing about the matter. According to our repeated rulings, it is certainly well settled, that witnesses are not permitted to testify to their motives, belief, or intentions, when secret and uncommunicated, such motives and intentions when relevant, being for the determination of the jury ; and it is not our purpose to question this rule, now too well settled to be disturbed. To have admitted this evidence would not, however, have infringed the rule.

The witness on his cross-examination by the State, conducted with the view of impeaching him, had, as we have seen, made an answer to the question, which, unexplained, tended to throw discredit on his evidence. To refuse to allow him, under such circumstances, to explain his motive in making the statement, would violate well established rules. Mr. Greenleaf says : "Common

justice requires that, first calling his attention to the sub-
ject, he should have an opportunity to recollect the facts,
and, if necessary, to correct the statements already
given, as well as by a re-examination to explain the
nature, circumstances, meaning and design of what he
is proved elsewhere to have said," and, as the author
says, he may be asked the motive by which he was in-
duced to use such expressions.—1 Greenl. Ev., §§ 462,
467. And, touching the same principle, this court has
heretofore held, that he may be asked what induced him
to give to the person to whom he made the communica-
tion, the account of it which on cross-examination he
admitted he gave.—*Campbell v. State*, 23 Ala. 76; *Lewis
v. Post*, 1 Ala. 69; 2 Russ. on Crimes, 937. We must
hold, therefore, that the court below erred in excluding
this evidence.

SECOND. On a re-argument of the cause, and a re-ex-
amination of the question, we are led to the conclusion,
that the jury which tried this defendant was illegally or-
ganized. Section 3 of the act of 28th February, 1887,
(Cr. Code, p. 132), requires the jury commissioners to
prepare a list of all persons between 21 and 60 years of
age, who are qualified by the terms of said act to serve
as jurors; and section 4,—copied in the main opinion,—
gives specific directions how grand and petit jurors are
to be drawn from the jury-box. We may fairly assume,
from common knowledge, and from the internal evidence
furnished by the terms of the act itself, and the statutes it
replaced, that one of the main purposes of the legislature
in this enactment was to remove, as far as practicable,
all opportunity for any officer, or set of officers, to select
out of his or their own heads a jury to try a party indicted
for crime, or to pack one in his favor. The temptations
to organize a jury for the occasion to acquit or convict,
as the person or persons selecting them might desire,
were too great, and the consequences to the welfare of
the cummunity and State too serious, not to provide as
ample safe-guards as practicable against such a practice,
and secure a fair and honest administration of the crimi-
nal law of the land.

To this end, the statute requires the commissioners to
take an oath to faithfully discharge the duties required
of them by the act, to keep secret the counsel of them-
selves and their associates, and not to declare the name

of any juror drawn until the *venire* shall have been is-
sued for the juror, and in the beginning to fill the box,
in the manner required by section 4, with the names of
the persons composing the list required to be made by
section 3 ; and, until this was done, it is fair to assume,
that no jury could have been legally organized by draw-
ings from said box.    After the box has thus been filled,
and the commissioners have proceeded to draw from it
the grand and petit juries for the succeeding terms of
the court, they are required by section 5 to prepare a
list of the names of the persons drawn as grand and
petit jurors, for each week of the term, separately, and
envelop and seal the same, and endorse them to the clerk
of the court, in which they are to serve, whose duty it is
made to issue summons for them as required by said
section.    The commissioners are also required by sec-
tion 6 to deposit in the box from which the names are
drawn copies of all lists furnished the clerk of any court,
and deposit the box securely locked and sealed in the
office of the judge of probate.    The president of the com-
mission is required to keep the key to said box, and no
one, besides himself and the jury commission, have ac-
cess to it, except the judges of the courts, for the pur-
pose of comparing the *venire* issued by the clerk with the
copy of the list furnished to him and for the purpose of
drawing special jurors in capital cases, as provided by
section 10 of the act.    The sheriff is not allowed to
select a juryman under said act, except in two instances.
If, at the time appointed for the trial of a capital case,
the jury should not be made of those summoned and
who appear, or if the said *venire* should be exhausted by
reason of challenges, or otherwise, then the court, as
provided in section 10, shall order the sheriff to sum-
mons from the qualified citizens of the county, twice the
number necessary to complete the jury, which process
may be repeated until the jury is completed ; or, if in
drawing a special jury for the trial of a capital case, as
provided in said section 10 of the act, the jury-box should
become exhausted, it is provided in section 12, that the
trial shall not, on that account, be delayed, but the court
shall direct the sheriff to summon the specified number
of qualified jurors necessary to complete said *venire* and
proceed with the trial.

　　We have referred thus particularly to the precaution-

ary measures provided by the legislature for the due execution of this criminal statute, removing, as far as may be consistent with the public interest, all opportunities to pack a jury for or against a defendant. We are not permitted to hold that these provisions are merely directory. In *Well's Case*, 94 Ala. 1, we held, that under the provisions of this statute, requiring the commissioners to first draw the regular number of names for grand jurors, and then the requisite number of petit jurors, they could not draw the entire number for both grand and petit jurors and then select from the whole the requisite number for grand jurors, leaving the others for the petit juries; and that a defendant in a capital case, might, on his motion, quash a venire composed partly of such petit jurors. The court, by its Chief Justice, Stone, said : ''We have no authority for going beyond the provisions of the statute, even though in doing so, we may appear to have done the defendant no actual injury. We must observe and enforce the law as it is written.''—*Goodwin v. The State*, 15 So. Rep. 571, *infra*.

Section 12 of said act provides, that if, at any time, when said jury commission meets to draw the juries, as provided in sections 4 and 6 of the act, there should be an insufficient number of jurors' names in the jury-box from which to draw the necessary juries therein required, then, it is made their duty to proceed, as required by said sections 3 and 4 of said act, to provide the necessary list of jurors and place the same in the said jury-box, and proceed to complete the drawings of said juries.

At the time the defendant's trial came on, the box having before that been exhausted, the commissioners had only partially completed the list and box, preparatory for use in future trials. G. L. Thomas, president of the jury commission, testified, that ''the jury commission found it necessary to draw the *venire* in this case from the box containing all the names of qualified jurors of the county which had been selected and put upon the list at the time of the drawing of said *venire*, and that the selection and list were only partially made and had not been completed at the time of the drawing of said *venire*, and at the time it was received by the clerk, and said selection and lists were not completed until the 29th day of March'' (1893).

[Johnson v. The State.]

The record shows that the judge of the court drew the names of the special jurors from said box, on the 3d day of April, 1893. How far the commissioners had proceeded in the completion of the box, and how many names there were in it, at the time the judge drew the special jurors, is not shown. From aught appearing, it may not have contained more than was sufficient to draw a jury in this case.

To proceed to draw from the box a jury to try the defendant, under such circumstances, was a violation of law, and against its whole spirit and policy. We would not intimate any unfairness on the part of the commisioners in arranging this box with reference to this or any other criminal case in that court, or that they were not proceeding fairly to discharge their duties. We have no evidence to lead us to suspect such a thing ; but, if such a practice as we review were held to be lawful, it removes one of the safeguards provided by the legislature against the possibility of having an unfair selection of jurors put upon a defendant.

It is no answer to our conclusion, that criminals tried under this law, after the first and successive drawings from said box, have fewer persons than the whole number first in the box, from which to have juries made up. This is the chance the law, and not the commissioners, puts upon them. The one results by operation of law from the drawing of previous juries, and the other may arise from the evil purpose of the parties making up the jury-box. To have completed the lists and filled the box as required by sections 3 and 4 of said act, after it had been exhausted, was mandatory and not directory. to the commissioners, before any drawing therefrom by themselves or the court could proceed.

We see no reason why these commissioners may not, if they are diligent, always have these lists made and the box filled in time to prevent delay and expense to the county in the drawing and empanelling of jurors. But, it for any reason, they have failed to have the box in readiness for the trial in the manner required by the statute, and delay in trials occurs in consequence, better that, than proceed in violation of the letter and spirit of the statute.

When for any cause, the court may not be able, in the trial of a capital case, to proceed under this statute to

[State ex rel. Attorney General v. Tally, Judge, &c.]

organize a jury, whether it might not proceed under other statutes of the Code to do so, *quere?* That question is not before us, and we do not decide it.

The foregoing are the only two grounds to which our attention has been called, which lead us to correct our former rulings in this case. In other respects we find no error in the record, and the original opinion stands affirmed.

Reversed and remanded.